**Edward June HACKNEY, individually and on behalf of all persons similarly situated, Appellant,**

**v.**

**Curtis W. TARR, as Director of the Selective Service System, et al., Appellees.**

**No. 15060.**

United States Court of Appeals, Fourth Circuit.

June 2, 1972.

Jeremiah S. Gutman, New York City (Levy, Gutman, Goldberg & Kaplan, New

York City, Norman B. Smith, and Smith & Patterson, Greensboro, N. C., on the brief), for appellant.

Bradley J. Cameron, Asst. U. S. Atty. (William L. Osteen, U. S. Atty., on the brief) for appellees.

Before HAYNSWORTH, Chief Judge, and BOREMAN and BRYAN, Circuit Judges.

HAYNSWORTH, Chief Judge:

The plaintiff, classified as a conscientious objector by the Selective Service System, contests the validity of his Local Board's rejection of his proposal of alternative civilian service at a university medical center in New York City, where he resides, and its order that he perform his service in a hospital in North Carolina. The action of the Local Board was concededly based on Selective Service regulations and implementing memoranda, set out in 32 C.F.R. § 1660.21(a) [1] and Local Board Memorandum No. 64 (as revised 1968).[2] Though the work in the New York hospital had the specific approval of the Selective Service System as appropriate for alternative civilian service, it was rejected by the Local Board "because this would not disrupt registrant's way of life."

Hackney had registered with Local Board No. 32, in Durham, North Carolina. He sought I–O classification as a conscientious objector. He obtained it when the Appeals Board unanimously reversed the Local Board's denial of it.

Hackney had acquired experience and skills in supportive medical services. Living in New York City he obtained employment as an inhalation therapist supervisor in a medical center there, and submitted that work to the Local Board as appropriate for his alternative civilian service. That center had the specific approval of the Selective Service System as an employer of conscientious objectors performing alternative civilian service, and the particular work Hackney was doing had been approved for others. Nevertheless, as indicated above, the Board rejected the suggestion for the stated reason that the New York job would not disrupt Hackney's life.

The Board then ordered Hackney to report to the Moses H. Cone Memorial Hospital in Greensboro, North Carolina for hospital work. Hackney reported there, but after three weeks, he quit and returned to his old job at the medical center in New York. He explained that his work at Cone was minimal and that it did not utilize his capabilities. The Board then ordered him to report to the Long Community Hospital in Greensboro for hospital work. Hackney did that, though protestingly, after commencing this action and unsuccessfully seeking a restraining order. It is agreed that his duties at Long were relatively menial and did not require any education or training of the sort Hackney had.

At oral argument, we were informed that Hackney had left his job at Long and had again returned to his old job at the medical center in New York. We were told he had quit because he lost his driver's license and found it impossible, or difficult, to get to and from the Long Hospital.

---

1. "No registrant shall be ordered by the local board to perform civilian work in lieu of induction in the community in which he resides unless in a particular case the local board deems the performance by the registrant of such work in the registrant's home community to be desirable in the national interest."

2. "1. Appropriate Civilian Work.
   Civilian work which is appropriate to be performed in lieu of induction into the Armed Forces by registrants classified in Class I–O should meet the criteria

prescribed in section 1660.1 of the Selective Service Regulations. Whenever possible the work should be performed outside of the community in which the registrant resides. The position should be one that cannot readily be filled from the available competitive labor force, or from civil service or merit registers of the Federal, State or local governments, *and should constitute a disruption of the registrant's normal way of life somewhat comparable to the disruption of a registrant who is inducted into the Armed Forces.* (Emphasis supplied.)"

I

In the Military Selective Service Act of 1967,[3] there is no mention of disruption of the life of anyone. It provides in § 456(j) that a conscientious objector, in lieu of induction into the armed forces, subject to such rules and regulations as the President may prescribe, shall perform for a period of two years "such civilian work contributing to the maintenance of the national health, safety, or interest as the local board pursuant to Presidential regulations may deem appropriate."[4] The statute is our text, though, in the context of this controversy, it is not the end of the matter.

By presidential regulation[5] it is provided:

"No registrant shall be ordered by the local board to perform civilian work in lieu of induction in the community in which he resides unless in a particular case the local board deems the performance by the registrant of such work in the registrant's home community to be desirable in the national interest."

In 1962 the Director of Selective Service issued a Local Board Memorandum which was amended in 1968. As amended, L.B.M. 64 provides that a position to which a registrant classified I-O is assigned "should constitute a disruption of the registrant's normal way of life somewhat comparable to the disruption of a registrant who is inducted into the Armed Forces." Obviously, L.B.M. 64 was the basis of the Local Board's reference to disruption.

It is said of the presidential regulation that it was designed to protect conscientious objectors from involuntary assignment in their home communities when there was risk that the registrant would be exposed to censure by erstwhile friends and neighbors and made to develop a sense of humiliation, unless that is, the national interest appeared to require an assignment in the registrant's home community notwithstanding the risk of such humiliation. This is derived solely from the regulation's use of the word "ordered." There is no legislative history to support that reading, however, and the apparent scheme is that every registrant classified I-O would be "ordered" to serve if his number comes up. Those satisfied with their assignments are ordered to perform the work just as those who are not.

It is provided in regulation 1660.20(a) that a registrant in Class I-O may not be called to civilian service earlier than he would have been called for induction into the Armed Forces had he been in Class I-A. Nor, under the same regulation, will such a registrant be ordered to alternative civilian service if, after an Armed Forces physical examination, he is found unfit for military service. When he is to be called up, a conscientious objector may suggest three preferences as to the type of work in the national interest he would like, but even if the Local Board accepts one of his suggestions, he is ordered to perform that service. He may even volunteer for such service, just as a registrant in Class I-A may volunteer for military service before his number is reached and he is ordered to report for induction, but the act of volunteering has the effect only of advancing the time of the order to report for civilian work.[6] The fact is that every person who reports for a period of alternative civilian service does so pursuant to an order. Each registrant classified I-O is informed of all this through SS Form 152.

In light of this, the use of the verb "ordered" in the regulation contains none of the implications Hackney would read into it.

It is more likely that the presidential regulation is a child of history. In World War I conscientious objectors were actually inducted into the Armed

3. 50 U.S.C.A.App. § 451 et seq.

4. 50 U.S.C.A.App. § 456(j).

5. 32 C.F.R. § 1660.21(a).

6. 32 C.F.R. § 1660.20(c).

Forces but were assigned to noncombatant duties. During World War II, they were not inducted into the Armed Forces but required to perform manual labor in civilian labor camps operated by pacifist organizations.[7] Since 1951 the statutes have treated the conscientious objector with more consideration, but the established parallelism between regular military service and the noncombatant or civilian service to which conscientious objectors had been assigned has left a remnant. Some elements of the parallelism still exist in the provision that the conscientious objector be ordered to serve a period of alternative civilian service only if he otherwise would be ordered inducted into the Armed Forces, receiving no such order if his number is not reached or if he is found mentally or physically unacceptable for military service.

Though we speculate that the presidential regulation may be a remnant of harsh provisions of earlier statutes, it reasonably serves a purpose to avoid exposure of registrants already employed in governmental or social work to the strong temptation to obtain exemption from military service by inflating practical preferences to matters of conscience.

The regulation is attacked on several grounds.

First, it is said that enforcement of the regulation may defeat the provision which gives the registrant an opportunity to inform the Local Board of three types of work he is able and willing to do. It is the type of work about which he is given a measure of choice, however, and not locational preference. It is difficult to conceive of a type of work which would be available only in a registrant's home community. Moreover, if any registrant should be hampered in making his choices by ignorance of the regulation, the remedy would be to assure more adequate notice rather than striking down the regulation.

Next the regulation is said to be vindictive. With its discretionary exception, however, a general rule of assignment of a conscientious objector outside his home community has a relatively slight impact upon one in comparison to all the risks, burdens and frustrations of military life he avoids when he seeks and obtains I–O classification. It could hardly have a chilling effect upon his decision to seek conscientious objector classification, for the possible burden of moving his residence is dramatically incomparable to the burdens of the military life he avoids. It cannot be reasonably said to be purely punitive as long as it reasonably tends to deter registrants who have no conscientious objection to war from claiming it out of a simple desire to remain where they are and in their current employment.

■ Nor can the regulation be said to be arbitrary. It is true that the student and others in deferred classifications cannot be required to change their residences, but they are in classifications which defer any type of service. They are subject to reclassification, and each of them may wind up in Class I–A, I–AO, or Class I–O, in which event each may be ordered to perform some service. The I–O registrant is functionally comparable only to those registrants in Class I–A and Class I–AO, and persons in those classes ordered inducted are always required to leave their residences and to shoulder other burdens which are not placed upon a conscientious objector.

■ The Director's L.B.M. 64 is a different thing, however. Its disruptive provision, introduced in 1968, appears to require disruption solely for the sake of disruption. That may have been one of the purposes of the earlier statutes, but the current statute clearly hinges assignments to alternative civilian service to the national health, safety, or interest. That interest governs the type of work to which the conscientious objector will

7. *See* Silard, Invalid Disruption Rules for CO Alternative Service, 3 Colum. Survey Human Rights L. 136, 142 (1971).

be assigned. A vindictive purpose to disrupt the registrant's life solely for the purpose of disruption would appear to subvert the expressed statutory purpose and the general design of the Act.

What happened to Hackney may or may not be typical. The Local Board found Hackney's employment at the medical center in New York unacceptable solely because it was not disruptive of his life. It assigned him to a hospital in North Carolina where there was no comparable need for his skills. He had too little to do, and the work was below his capability. Quitting after a few weeks,[8] he was then reassigned to a community hospital in North Carolina in which his tasks were menial and there was apparently no utilization of his training and skills.

■ Until 1969, SS Form 152 informed every I-O registrant that it was the policy of the System "whenever possible to order you to civilian work which will most fully utilize your experience, education and training."[9] This would seem appropriate as long as the governing standard is the national interest. Of course, a Board might find a greater need for services involving lesser skills than a service which is already in adequate supply, and no registrant has a right to decide for himself, as Hackney attempted, that kind of a question. He has a right to propose and negotiate, but the ultimate decision, which may involve many factors, is for the Board, not the registrant.

■ It is clear, here, however, that the Board did not apply the statutory standard of the national interest. It rejected the work at the medical center in New York solely because work there would not disrupt Hackney's life as required by L.B.M. 64. Since that consideration was irrelevant and impermissible, the Board's order was invalid.

The decisions of the Supreme Court striking down delinquency regulations [10] are not directly apposite, of course. Their reasoning, however, provides general support for our conclusion that vindictiveness for the sake of vindictiveness and disruption for the sake of disruption have no place in the execution of a statute which provides the public interest as the exclusive standard for administration.[11]

The judgment is reversed and the case remanded to the District Court with instructions to issue a mandatory injunction requiring the Local Board to credit Hackney with his period of service in the medical center in New York and, if his two-year period of service is not complete, to disregard L.B.M. 64 in ordering him to any further service, though it may enforce the presidential regulation against work assignments in the registrant's home community except when required in the public interest.

*Reversed.*

---

8. We do not condone that. Had the Board not confessedly departed from the statutory standard, that act would have been a violation of 50 U.S.C.A. App. § 456 (j) subject to the penalties of § 462(a).

9. Silard, *supra*, n. 7, at 153.

10. Oestereich v. Selective Service System, 393 U.S. 233, 89 S.Ct. 414, 21 L.Ed.2d 402 (1968) ; Gutknecht v. United States,

396 U.S. 295, 90 S.Ct. 506, 24 L.Ed.2d 532 (1970) ; Breen v. Selective Service System, Local Board No. 16, 396 U.S. 460, 90 S.Ct. 661, 24 L.Ed.2d 653 (1970).

11. *See*, Silard, *supra*, n. 7 ; Walkup, "Swords into Plowshares," Alternative Service Requirements for Conscientious Objectors, 6 Harv.Civ.Rights—Civ.Lib.L. Rev. 505 (1971).