William Robert **ROBISON**, on behalf of himself and all others similarly situated, Plaintiff,

v.

Donald E. **JOHNSON**, Administrator of Veterans' Affairs; and Veterans Administration of the United States, Defendants.

Civ. A. No. 72–434–G.

United States District Court, D. Massachusetts.

Jan. 4, 1973.

---

Matthew Feinberg, Civil Liberties Union, Boston, Mass., David Rosenberg, Charles R. Nesson, Harvard Law School, Cambridge, Mass., for plaintiff.

William Brown, Asst. U. S. Atty., for defendants.

## OPINION

GARRITY, District Judge.

■ Plaintiff Robison seeks a declaratory judgment, on behalf of himself and all others similarly situated, that the system of veterans' educational benefits provided in 38 U.S.C. §§ 101(21), 1652(a)(1) and 1661(a), as amended, violates the First and Fifth Amendments to the Constitution of the United States. Plaintiff also seeks a declaratory judgment that he and the members of his class are eligible to receive such educational benefits. Defendants are the Administrator of Veterans' Affairs and the Veterans Administration. The court has before it plaintiff's motion for summary judgment and defendants' motion to dismiss.[1] Upon consideration of these motions, and the memoranda of the parties, and after a consolidated hearing, plaintiff's motion for summary judgment is granted as to both the declaration of unconstitutionality and the declaration of eligibility. The defendants' motion to dismiss is correspondingly denied.

---

1. The court considered *sua sponte* exercising its discretion under 28 U.S.C. § 2201 to decline jurisdiction on the ground that, despite plaintiff's omission to request an injunction, the case involved special circumstances warranting consideration by a three-judge court, see Smith v. Pearson, N.D.Miss., 1968, 294 F.Supp. 611, and Fremed v. Johnson, D.Colo., 1970, 311 F.Supp. 1116; and invited briefs from the parties on the point. See generally the definitive article by Professor Currie, The Three-Judge District Court in Con-stitutional Litigation, 32 U.Chi.L.Rev. 1, 76–78 (1964). The court decided against declining declaratory jurisdiction partly because the declaratory judgment entered herein will extend the benefits of 38 U.S.C. §§ 1651–1697 to plaintiffs rather than result in an "interdiction of the operation at large of the statute." Kennedy v. Mendoza-Martinez, 1963, 372 U.S. 144, 155, 83 S.Ct. 554, 560, 9 L.Ed.2d 644. Cf. Richardson v. United States, 3 Cir., 1972, 465 F.2d 844, 854–856.

The court also rules that certification of a class, pursuant to Fed.R.Civ.P. 23, is warranted, the class to include all those selective service registrants who have completed 180 days of "alternate service" pursuant to 50 U.S.C. App. § 456(j), and who have either (1) satisfactorily completed two years of such service or (2) been released therefrom for medical or other reason after 180 days of such service.

Plaintiff is a selective service registrant who in 1966 applied to his local board in Fairfax, Virginia, for classification as a conscientious objector to any type of military service. After a personal appearance, plaintiff was accorded conscientious objector (1–O) status and, pursuant to 50 U.S.C. App. § 456(j), he was ordered to report to Peter Bent Brigham Hospital in Boston, Massachusetts, to perform his alternate service.[2] This service lasted for the required two years, after which time plaintiff applied to the Veterans Administration for educational assistance benefits to enable him to pursue legal studies. In December of 1971 the Veterans Administration informed plaintiff that he was ineligible for benefits, because the alternate service which he performed is not "active duty" within the meaning of 38 U.S.C. § 1652(a)(1), as amended.

A conscientious objector opposed to all military service is subject to stringent alternate service requirements. He is called for service in the same manner, and in the same order-of-call, as potential draftees, 32 C.F.R. § 1660.2, and is ordered to perform, for a period equal to that of draftees, "such civilian work contributing to the maintenance of the national health, safety, or interest as the local board pursuant to Presidential regulations may deem appropriate . . . ." 50 U.S.C. App. § 456(j). Any person knowingly violating such an order may be prosecuted in the same manner as a person who refuses to submit to induction in the armed forces. *Id.* Moreover, the selective service regulations purport to make criminal any violations by persons performing alternate service of their employers' reasonable orders. 32 C.F.R. § 1660.8.

Under present regulations, five elements are considered in determining the acceptability of a proposed job as alternate service: (1) the work must be in the national health, safety or interest; (2) it must not be a job that is in the competitive job market; (3) compensation must approximate that of military personnel; (4) a registrant's special skills may be used; (5) a registrant must work outside his community.[3] 32 C.F.R. § 1660.6(a)(1)–(5). Only the first of these is explicitly mandated by statute. See 50 U.S.C. App. § 456(j). The permissibility of the rest of them has been the subject of lively debate; some have argued that the regulations' similar predecessors, and various local board memoranda that were promulgated by the Selective Service System, were not valid because they imposed criteria beyond that of the "national health, safety and interest." See Silard, Invalid Disruption Rules for CO Alternative Service, 3 Colum. Survey of Human Rights Law 136 (1971). In one case the court ruled that a local board, in processing a proposed alternate service job, could not disapprove a job simply because it did not sufficiently disrupt a registrant's life. Hackney v. Tarr, 4 Cir., 1972, 460 F.2d 575. Under the regulations, elements (3), (4) and (5) of 32 C.F.R. § 1660.6 may be waived by the state director of selective service if to do so would be in the national interest.

Having set out these requirements for alternate service, the court thinks it appropriate to state, even at this early

---

2. Compulsory civilian service, even absent a declaration of war, has been found not unconstitutional. See *United States v. Holmes*, 7 Cir., 1968, 387 F.2d 781, cert. denied, 1968, 391 U.S. 936, 88 S.Ct. 1835, 20 L.Ed.2d 856.

3. Former regulation 32 C.F.R. § 1660.31 (b) permitted "assignment and abrupt reassignment in any part of the United States, or overseas, including war zones."

stage in the opinion, one of its key findings, which will be developed more fully later. The court finds that the statutory and regulatory scheme governing the performance of alternate service [4] results in a disruption in the lives of alternate service performers which, when considering the purposes of the veterans' educational benefits legislation—a subject to which we will return—is ordinarily as great as that to which active duty veterans have been subjected. In United States v. Boardman, 1 Cir., 1969, 419 F. 2d 110, 112, the court noted that Congress designed the alternate service program "to alleviate the unfairness which results if conscientious objectors continue to enjoy the fruits of civilian life while their fellow citizens are conscripted. . . ." It is thus not surprising that alternate service performers find themselves in the same situation as military veterans with respect to the curtailment of their pursuit of civilian goals. The curtailment is the product of deliberate congressional action.

The Veterans' Readjustment Benefits Act of 1966, which is codified in chapter 34 of Title 38, United States Code, 38 U.S.C. §§ 1651–1697, as amended, was designed to provide for cold war veterans what earlier legislation had provided for World War II and Korean conflict veterans. Under the 1966 Act, "eligible veterans" receive educational assistance payments to help them pursue educational or vocational training at approved institutions.[5] Generally, eligible veterans are all those persons, whether they enlisted or were drafted, who have served on "active duty" for more than 180 days and were other than dishonorably discharged. 38 U.S.C. § 1652(a)(1). "Active duty" is defined in 38 U.S.C. § 101(21) as full-time duty in the Armed Forces, the Public Health Service, the Coast and Geodetic Survey, service at an armed forces academy, and time spent traveling to and from such service. This definition is applicable to all veterans' benefits legislation under Title 38. The scope of what constitutes "active duty" for purposes of educational assistance is somewhat narrower than it is for other forms of assistance. As is clearly evident from these definitions, plaintiff and members of his class, who have performed alternate service under 50 U.S.C. App. § 456(j) and applicable regulations, do not qualify for veterans' benefits. It is solely their exclusion from educational benefits, however, that they attack here as unconstitutional. Thus, 38 U.S.C. § 101(21) defining "active duty" is attacked in this case only as it pertains to chapter 34 of Title 38, and our holding has no bearing on § 101(21) as it pertains to other chapters of the same Title dealing with other types of veterans' benefits, e. g., insurance, hospital care, vocational rehabilitation, and home, farm and business loans.

Plaintiff contends that the legislation extending educational assistance benefits to veterans of military service, and certain other classes of persons, but not to persons like himself who have performed alternate service, invidiously discrimi-

4. The regulations extant during the time of plaintiff's service varied slightly, but not materially, from current regulations. Two advisory memoranda, from the Director of Selective Service to local boards, were in effect during plaintiff's period of service. These made explicit the Service's policy that local boards should not approve proposed alternate service jobs that do not "constitute a disruption of the registrant's normal way of life somewhat comparable to the disruption of a registrant who is inducted into the Armed Forces.' Local Board Memorandum No. 64, issued March 1, 1962, rescinded Feb. 8, 1972, reported at 4 S.S.L.R. 2183. See also Local Board Memorandum No. 98(2), issued Sept. 11, 1969, rescinded Feb. 8, 1972, reported at 4 S.S.L.R. 2200:-7. The criteria mentioned in these memoranda are those stated in current regulation 32 C.F.R. § 1660.6(a).

5. The basic monthly payment is $175 for full-time institutional students, $141 for full-time students in farm cooperative programs and $108 for participants in apprenticeships or other on-the-job training programs. All figures increase if the veteran has dependents. 38 U.S.C. §§ 1682, 1683.

nates against him and his class, thereby denying him due process of law under the Fifth Amendment to the Constitution of the United States. Relying on legislative history, plaintiff asserts that the overriding objective of the educational benefits legislation was to compensate persons performing military duty for the disruption in their lives and the deprivation of educational opportunities that their military duty entails. Contending that alternate service similarly disrupts the lives of conscientious objectors who have been drafted into alternative service and deprives them of educational opportunities, plaintiff urges that, whether the legislation be judged under the compelling interest analysis, Shapiro v. Thompson, 1969, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600, or the rational relationship analysis, Dandridge v. Williams, 1970, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491, the legislation is unconstitutional. Plaintiff further claims that the legislation violates the First Amendment by inhibiting him and his class in the free exercise of their religion.

■ Defendants have contended that the complaint should be dismissed because the educational benefits statute is constitutional; and also that the court lacks jurisdiction over the subject matter, relying mainly on 38 U.S.C. § 211(a), as amended, which provides, "the decisions of the Administrator of any question of law or fact under any law administered by the Veterans' Administration providing benefits for veterans . . . shall be final and conclusive and no . . . court of the United States shall have power or jurisdiction to review any such decision . . . ." However, plaintiffs do not seek review of any such decision nor any affirmative relief, see Hernandez v. Veterans Administration, N.D.Cal., 1972, 339 F.

Supp. 913, 914, aff'd per curiam, 9 Cir., 1972, 467 F.2d 479,[6] but rather a declaratory judgment that a "law [being] administered by the Veterans Administration" violates the Constitution of the United States. The questions of law presented in these proceedings arise under the Constitution, not under the statute whose validity is challenged. Therefore § 211(a) is inapplicable and dismissal for lack of jurisdiction over the subject matter is denied.

■ Defendants have also moved to dismiss on the ground that plaintiff has not exhausted his administrative remedies. It is clear, however, that plaintiff has no such remedy available to him, because the Board of Veterans Appeals has gone on record as stating that it has no jurisdiction to decide the constitutionality of the educational benefits legislation. In the Appeal of Peter W. Sly, Board of Veterans Appeals, 1972, Docket No. 72–07421. Since plaintiff's request for a declaration of eligibility could not be granted without first deciding that the educational benefits legislation is unconstitutional, it is clear that plaintiff could not have his claims heard by appealing through administrative channels.

On the merits of the equal protection issue, defendants argue that the fact that there are basic differences between military duty and alternate service is a basis upon which Congress could constitutionally decide to tender the "gratuity" of educational benefits to veterans but not to plaintiff and his class. Defendants contend that the exclusion of plaintiff and his class bears a rational relationship to the constitutionally granted power of Congress "to raise . . . Armies." United States Constitution, art. 1, § 8. Addressing the plaintiff's free exercise claim, defendants maintain that the claim is invalid

---

6. Milliken v. Gleason, 1 Cir., 1964, 332 F. 2d 122, on which defendants rely, where plaintiff sought review and rescission of an order terminating pension benefits theretofore paid to her, is obviously distinguishable. So are Wellman v. Whit-

tier, 1958, 104 U.S.App.D.C. 6, 259 F.2d 163, Tracy v. Gleason, 1967, 126 U.S. App.D.C. 415, 379 F.2d 469, and other cases, see 1970 U.S.Code Cong. and Adm. News, pp. 3729–3731, leading to the 1970 amendment to 38 U.S.C. § 211(a).

because the statute under attack has at most an indirect effect on the exercise of religion by conscientious objectors.

## I

On the due process claim, plaintiff maintains that the legislation denies him and his class a fundamental right—educational benefits—and effects a suspect classification—conscientious objectors—and that the compelling interest test applies on either of these grounds. Plaintiff points out that the Supreme Court has exercised exacting scrutiny of legislation that affects fundamental rights, such as voting, Harper v. Virginia Board of Elections, 1966, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169; procreation, Skinner v. Oklahoma ex rel. Williamson, 1942, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655; and travel, Shapiro v. Thompson, 1969, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600; and of legislation that effects suspect classifications, such as race, McLaughlin v. Florida, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222, and alienage, Takahashi v. Fish & Game Comm'n, 1948, 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478. Legislation withstands such scrutiny only if "shown to be necessary to promote a *compelling* governmental interest," Shapiro v. Thompson, *supra,* 394 U.S. at 634, 89 S.Ct. at 1331. The test, however, is hardly neutral, for where it applies, the legislation rarely passes constitutional muster. For a rare example, see Korematsu v. United States, 1944, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194.

Several factors cause us to doubt that the stricter standard is appropriate in this case. First, although the Supreme Court has many times stressed the importance of education, see, e. g., Brown v. Board of Education, 1954, 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873, the Court has never held that the denial of an education, standing alone, would trigger active review.[7] It was basically the invidiousness of denying the racial minorities equality of educational opportunity that brought about the *Brown* case and its progeny. The Supreme Court may well shed some light on this disputed issue[8] when it decides the school financing case this term, see Rodriguez v. San Antonio Ind. School District, W.D. Tex., 1971, 337 F.Supp. 280, prob. juris. noted, 1972, 406 U.S. 966, 92 S.Ct. 2413, 32 L.Ed.2d 665. Under current principles, however, the court cannot conclude that education is, for purposes of selecting the standard of review in this case, a so-called fundamental interest. And even if we were inclined to so treat it, there would be the additional problem that the educational benefits here do not involve grade school education, which the Supreme Court has described as the "foundation of good citizenship," see Brown v. Board of Education, *supra,* 347 U.S. at 493, 74 S.Ct. 686, but largely involves higher education and job training, the constitutional significance of which is open to question. But see Sweatt v. Painter, 1950, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114.

Secondly, the court is not fully persuaded that the legislation results in a "suspect classification." The justification for subjecting to strict scrutiny those statutory exclusions that effect suspect classifications is that the normal political processes may have broken down where legislation involves minority groups with no political clout. The Supreme Court first suggested the possibility of strict review in such situations in a footnote dictum, see United States v. Carolene Products Co., 1938, 304 U.S.

7. In Griffin v. County School Board, 1964, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256, the Court held that defendant school board had denied black school children equal protection by closing public schools in the county, not because of the fundamental importance of education but because the sole purpose of the closing was to frustrate school integration. 377 U.S. at 231, 84 S.Ct. 1226.

8. Compare Serrano v. Priest, 1971, 5 Cal. 3d 584, 96 Cal.Rptr. 601, 487 P.2d 1241, with McInnis v. Shapiro, N.D.Ill., 1968, 293 F.Supp. 327, aff'd mem. sub nom. McInnis v. Ogilvie, 1969, 394 U.S. 322, 89 S.Ct. 1197, 22 L.Ed.2d 308.

144, 152–153 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234. Since then, the Supreme Court has scrutinized classifications based on race, McLaughlin v. Florida, *supra*; alienage, Graham v. Richardson, 1971, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534, and national ancestry, Korematsu v. United States, *supra*, but has not extended the suspect classification doctrine beyond those groups. Plaintiff contends that conscientious objectors are a "discrete and insular minority," Carolene Products, *supra*, 304 U.S. at 152–153 n. 4, 58 S.Ct. 778, deserving of judicial protection. But believing, as we explain *infra*, that plaintiff's free exercise of religion is not impaired by the challenged legislation, we hesitate to give an essentially religious group special treatment at the back door of equal protection. Our hesitancy is buttressed by the fact that Congress, which is under no obligation to carve out the conscientious objector exemption for military training, see United States v. Macintosh, 1931, 283 U.S. 605, 624, 51 S.Ct. 570, 75 L.Ed. 1302; Gillette v. United States, 1971, 401 U.S. 437, 457, 461 n. 23, 91 S.Ct. 828, 28 L.Ed.2d 168, has nevertheless done so. Perhaps this exemption from military training reflects a congressional judgment that conscientious objectors simply could not be trained for duty; but it is equally plausible that the exemption reflects a congressional determination to respect individual conscience. See United States v. Macintosh, *supra*, 283 U.S. at 633, 51 S.Ct. 570 (Stone, C. J., dissenting). Given the solicitous regard that Congress has manifested for conscientious objectors, it would seem presumptuous of a court to subject the educational benefits legislation to strict scrutiny on the basis of the "suspect classification" theory, whose underlying rationale is that, where legislation affects discrete and insular minorities, the presumption of constitutionality fades because traditional political processes may have broken down. Moreover, the legislation does not purport to discriminate on the basis of the beliefs of the excluded class, but on the basis of whether active military duty has been performed. Although this distinction is somewhat of a red herring, it is nonetheless true that the statute does not appear to be invidious. Compare Reed v. Reed, 1972, 404 U.S. 71 at 73, 92 S.Ct. 251, 30 L.Ed.2d 225. Indeed, plaintiff argues that the exclusion of himself and his class may have been merely accidental; and this is practically a concession that the normal political processes did not in fact break down in the drafting of chapter 34. Nevertheless, we would be blind not to recognize that the legislation has the *effect* of excluding from coverage a discrete group of persons characterized by their firm beliefs in opposition to war. We simply state, however, that this fact does not of itself trigger active review.

A third factor that casts doubt on the appropriateness of employing strict scrutiny is that the legislation is not attacked under the Fourteenth Amendment, but under the Fifth. Although the due process clause contains, as stated in United States v. Bishop, 1 Cir., 1972, 469 F.2d 1337, an "equal protection element," and although the Supreme Court has often gauged the constitutionality of federal legislation or action under equal protection principles, see Bolling v. Sharpe, 1954, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884; Shapiro v. Thompson, *supra*, 394 U.S. at 641–642, 89 S.Ct. 1322, 22 L.Ed.2d 600 (involving the District of Columbia welfare provision similar to Connecticut's), the Court has said that due process and equal protection are not interchangeable, Bolling v. Sharpe, 347 U.S. at 499, 74 S.Ct. 693; hence the appropriateness of subjecting federal legislation to equal protection analysis can only be determined on a case-by-case basis. While the court recognizes the potential double standard that may result from this approach, the court is especially loathe to adopt the simplistic compelling interest approach with respect to this legislation, one of whose stated purposes stems from the explicit constitutional power to raise armies.

In spite of these factors that militate against application of the compelling interest analysis, the court does consider that the undeniable effect of this legislation is to deny important benefits to a discrete minority. The nexus of these two factors may justify a form of heightened, if not strict, scrutiny into the legislation. What such an approach might entail is obviously difficult to determine. Perhaps some form of balancing of the interests involved would be appropriate. Or the court could place on the defendants the burden of showing a high degree of relevancy between the exclusion of plaintiff and his class from eligibility and the stated purpose of the legislation. But the fashioning of such rules is better left to appellate courts, and we find it unnecessary to attempt the exercise in this case: for even under the rational basis standard of review, we believe that the exclusion of plaintiff and his class is unconstitutional.

## II

■ Under the traditional standard, a challenged legislative classification violates equal protection only if it bears no "fair and substantial relation to the object of the legislation." Royster Guano Co. v. Virginia, 1920, 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989. Recently the Supreme Court has had occasion to apply this test. In Reed v. Reed, 1971, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225, for example, the Court considered the constitutionality of Idaho's provision that gave preference to men over women when members of the same entitlement class applied for appointment to administer a decedent's estate. Citing the *Royster Guano* case, the Court asserted that the test of the legislation was the traditional one of whether the classification "bears a rational relationship to a state objective," *id.* at 76, 92 S.Ct. at 254. The Court acknowledged that Idaho's interest in eliminating some hearings was "not without some legiti-

macy," *id.*, but this fact did not save the statute. For the Court held that the mandatory sex classification, established "merely to accomplish the elimination of hearings on the merits, is to make the very kind of arbitrary legislative choice forbidden by the Equal Protection Clause," *id.* Implicit in the Court's opinion was the idea that Idaho's method of attaining its objective was wholly arbitrary and therefore irrational.

The Court again employed the traditional standard in Weber v. Aetna Casualty & Surety Co., 1972, 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768. There the Court held that the challenged classification, which denied to dependent unacknowledged, illegitimate children equal recovery with other dependent children in workmen's compensation benefits, bore no "significant relationship to those recognized purposes of recovery which workmen's compensation statutes commendably serve." *Id.* at 175, 92 S. Ct. at 1406.[9] Thus, it is apparent that the traditional standard has not varied materially during its long period of usage by the Supreme Court.

Applying the rational relationship test to the challenged exclusion, the starting point is the preamble to the Act in which Congress stated its purposes in enacting the educational benefits legislation, specifying the following four purposes: "(1) enhancing and making more attractive service in the Armed Forces of the United States, (2) extending the benefits of a higher education to qualified and deserving young persons who might not otherwise be able to afford such an education, (3) providing vocational readjustment and restoring lost educational opportunities to those servicemen and women whose careers have been interrupted or impeded by reason of active duty . . . and (4) aiding such persons in attaining the vocational and educational status which they might normally have aspired to and obtained

9. The Court rejected as "illogical and unjust" any interest in condemning ille-gitimacy by condemning illegitimates themselves. *Id.* at 175, 92 S.Ct. 1400.

had they not served their country." 38 U.S.C. § 1651.

Regarding the first of the stated purposes, obviously the government has an important interest in raising armies and, by extension, in making military service attractive.[10] Our inquiry does not end there, however, for under rational basis analysis, the court must ask: is the exclusion of alternate service performers rationally related to the promotion of the government's interest in making military service more attractive? We think not. A contrary conclusion would seem to rest on one or two tenuous assumptions. First, it would assume that if the statute were changed to afford benefits to persons who have performed alternate service, then many persons who would go into military service, under the statute as now written, would choose alternate service because they would get educational benefits to the same extent as persons performing military duty. Like the objective in Reed v. Reed, *supra*, this assumption is "not without some legitimacy." But there are already important safeguards in the Selective Service system for ensuring that persons seeking conscientious objector status are in fact sincere.[11] Applicants for this status are subject to extensive questioning to determine the sincerity of their convictions, and the court cannot accept the notion that a fraud-minded registrant, intent on seeking conscientious objector status solely because he can later obtain educational benefits, would succeed in obtaining such an exemption. And even if this were occasionally possible, the court very much doubts that many persons would make the attempt. The assumption that the challenged exclusion deters fraudulent seeking of conscientious objector exemptions is thus so fragile that it cannot support the inference that

a rational connection exists between the exclusion and the goal of increasing enlistments into the armed services.

Another assumption upon which one might attempt to base a rational connection between the exclusion and the goal of increasing enlistments would be that some persons who are conscientious objectors in fact are willing to join the military so that they can get the educational benefits. Here, however, it is apparent that the argument centers around a group of persons consisting of those who (1) are conscientiously opposed to war and could, if they wished, obtain an exemption, but who (2) know about the existence of educational benefits, and (3) are willing to suppress their scruples and wear the uniform because they can obtain educational benefits when they leave active duty. This group, if it indeed exists, is surely a small one, for its members are largely irrational people. While we have found that active duty veterans and alternate service performers are similarly situated with respect to the disruption in their educational careers, it is abundantly clear that active duty is more rigorous, demanding and hazardous than alternate service. Moreover, without intending to enter "the somewhat theological debates about the nature of 'control' over one's own conscience," Ehlert v. United States, 1971, 402 U.S. 99, 105, 91 S.Ct. 1319, 1323, 28 L.Ed.2d 625, the court considers that conscientious objectors, by definition, do not "choose" whether or not to follow the dictates of their consciences: they are morally bound to follow them and shun military service. Given these facts, the court finds that this assumption—that the challenged exclusion will attract into active duty persons who are in fact conscientious objectors—is highly speculative and does not support the required inference that a rational con-

10. As explained later in this opinion, the legislative history of the Act shows that, though first mentioned in 38 U.S.C. § 1651, this purpose was not the primary one.

11. If the compelling interest analysis were applicable here, these safeguards would be the "less drastic means" that the government would use in deterring fraud. Cf. Shapiro v. Thompson, *supra*, 394 U.S. at 637, 89 S.Ct. 1322, 22 L.Ed.2d 600.

nection exists between the exclusion and the goal of "enhancing and making more attractive service in the Armed Forces of the United States." [12]

Purposes (2), (3) and (4) specified in 38 U.S.C. § 1651 are basically variations on a single theme and should be read in conjunction with the legislative history of the Veterans Readjustment Benefits Act of 1966. They demonstrate that Congress' plan to provide educational benefits was "based upon the continued existence of the compulsory draft law, which calls only a select group of men away from their private lives to perform military service on behalf of the entire Nation." Senate Committee on Labor and Public Welfare, Cold War Veterans' Readjustment Assistance Act, S.Rep.No. 269, 89th Cong., 1st Sess. 7 (hereinafter Senate Report). The Senate Committee's belief was that the "competitive element in our civil life" puts persons subject to the draft at a distinct disadvantage with those who are able to avoid national service. Senate Report at 8. The draft has a "depressant effect on young men's employment potential," *id.*, because employers are unwilling to train men with unsatisfied military obligations. Also, the numerous uncertainties of military obligations make it impossible for these young men to plan ahead, and discourage them from "immediately entering advanced training in the sciences, technical vocations, teaching and other professions that the Nation is needing increasingly." *Id.* The Senate Report then goes on to downplay any notion regarding this legislation that its beneficiaries are being rewarded for serving their country; the Committee acknowledged that even those who enlist are often motivated to do so because of the compulsory draft law. The report speaks of servicemen "losing time from civil life," and how "today's servicemen drop farther and farther behind their civilian contemporaries who generally pur-

sue educational objectives, or enjoy the higher wage scales and other economic advantages of civil life." *Id.* at 10. That the law's purpose was to compensate veterans for the deprivation of educational and economic opportunities that inhere in military service and not to reward them for their exposure to the physical risks of military life is further evident in the Committee's refusal to limit eligibility to veterans who served in combat zones. *Id.* at 19. The shorter House Committee report on the legislation reiterated the compensation-in-kind philosophy, stating that the law "would help a veteran to follow the educational plan that he might have adopted had he never entered the Armed Forces." House Committee on Veterans' Affairs, Veterans' Readjustment Benefits Act of 1966, H.R.Rep.No.1258, 89th Cong., 1st Sess., cited in 1966 U.S.Code Cong. and Adm.News, at p. 1890.

The legislative history thus emphasizes Congress' purpose, in enacting chapter 34, of attempting to eliminate the educational gaps between persons who served their country and those who did not. The exclusion from eligibility of plaintiff and his class would be justified if they do not suffer the same disruption in educational careers as do military veterans, and thus are not similarly situated with respect to the statute's purpose. We believe, as we stated earlier, that the disruption is equal as between the two groups. Like military veterans, alternate servicemen have been exposed to the uncertainties caused by the draft law. They too were burdened at one time by an unsatisfied military obligation that adversely affected their employment potential; were forced, because of the draft law, to forego immediately entering into vocational training or higher education; and were deprived, during the time they performed alternate service, of the opportunity to ob-

12. Indeed, the granting of benefits after only 180 days of active duty may discourage re-enlistments and thus tend to defeat the goal of enhancement, as the General Counsel of the Department of Defense pointed out to the Committee on Labor and Public Welfare. See Senate Report, at 24.

tain educational objectives or pursue more rewarding civilian goals.

■ The court is naturally aware that many military veterans have been subjected to hazardous duty, while alternate service performers have not. But that fact is not relevant when this purpose of the educational assistance legislation—to compensate persons for the disruption of their civilian lives—is taken into account. As the Supreme Court has said many times, "the criterion for differing treatment must bear some relevance to the object of the legislation." Bullock v. Carter, 1972, 405 U.S. 134, 145, 92 S.Ct. 849, 857, 31 L.Ed.2d 92; Morey v. Doud, 1957, 354 U.S. 457, 465, 77 S.Ct. 1344, 1 L.Ed.2d 1485. See also Tussman and tenBroek, The Equal Protection of the Laws, 37 Cal.L.Rev. 341, 346. Although military veterans and alternate service performers lead different lives, their service lives have shared one common denominator: the inability to pursue the educational and economic objectives that persons not subject to the draft law could pursue. Congress, however, has seen fit to compensate for this inability only with respect to one group of persons and not with respect to another that is similarly situated. The exclusion most surely does not promote the compensatory purpose, and inclusion would in no way tend to defeat the legislation's admirable goal of eliminating one of the inequities produced by the draft law and service life. Last term the Supreme Court said in Bullock v.

Carter, *supra*, 405 U.S. at 145, 92 S.Ct. at 857, that "even under conventional standards of review, a State cannot achieve its objectives by totally arbitrary means . . . ." We conclude that the challenged exclusion is arbitrary and without any relevance to either the enhancement of service goal or the compensation goal. Accordingly, we believe that the exclusion violates the Due Process Clause of the Fifth Amendment.[13]

There is another factor—which the parties have not argued—that amplifies the discriminatory effect that the denial of educational benefits has upon persons who have performed alternate service. Upon separation from service, veterans are entitled to certain reemployment rights secured by 50 U.S.C. App. § 459(b)–(g). Such persons are generally entitled to have their employers restore them to the positions they held before entering service, without loss of seniority, status or pay. 50 U.S.C. App. § 459(b).[14] It is clear from § 459, however, that all of the section's benefits accrue only to persons "inducted into the armed forces . . . for training and service," § 459(a), and thus do not accrue to persons who have performed alternate service, who are left after alternate service at the mercy of their employers. In light of this fact, persons who have performed alternate service may actually be in greater need of educational or vocational training benefits than military veterans.

13. A contrary opinion was expressed in Hernandez v. Veterans Administration, N.D.Cal., 1972, 339 F.Supp. 913, aff'd per curiam, 9 Cir., 1972, 467 F.2d 479. To the extent that plaintiffs there sought affirmative relief, i. e., an injunction and mandamus requiring the defendant to make educational assistance payments to them, and asserted underlying jurisdiction despite the provisions of 38 U.S.C. § 211(a), the only aspect of the complaint discussed by the Court of Appeals, that case is distinguishable from this one. Regarding denial of California plaintiffs' prayer for declaratory relief, we interpret the legislative history of the Act differently than did the District Judge

in that case and respectfully disagree with his conclusion.

14. Moreover, such persons shall be deemed to have been on leaves of absence and "shall not be discharged from such [restored] position without cause within one year after such restoration." 50 U.S.C. App. § 459(c). The United States Attorney in the district where the employer from whom restoration is sought maintains his place of business shall act as the veteran's attorney in the pursuit of bona fide claims under § 459. The federal district court in that same district has jurisdiction to hear such claims, and must order a speedy hearing in such cases.

## III

With respect to plaintiff's claim that his ineligibility to receive educational benefits is an impermissible burden on the free exercise of his religion, the defendants contend that the burden, if there is any, is merely indirect, and thus does not offend the First Amendment. The initial question, however, is not whether the burden is direct or indirect: even if it were the latter, it could be justified only if the government could not "accomplish its purpose by means which do not impose such a burden," Braunfeld v. Brown, 1961, 366 U.S. 599, 607, 81 S.Ct. 1144, 1148, 6 L.Ed.2d 563. And having already held that there is no rational relationship between the challenged exclusion and the purposes of the legislation, it would seem to follow, a fortiori, that the legislation does not meet the *Braunfeld* test, if applicable. · See also Sherbert v. Verner, 1963, 374 U.S. 398, 406, 83 S.Ct. 1790, 10 L.Ed.2d 965.

■ Our initial question, rather, is whether the burden alleged by plaintiff is of such a nature that it even merits our application of the principles outlined in the *Braunfeld* and *Sherbert* cases. We think it is not, and we think it helpful to consider briefly some of the leading free exercise cases that the Supreme Court has decided. In the *Braunfeld* case, the Court acknowledged that Pennsylvania's Sunday closing law had the tendency of forcing sabbatarians to choose between their economic livelihood and their religion. In our understanding, the Court upheld the law only because there was no way for Pennsylvania to achieve its goal—a day of rest—without having the law apply to sabbatarians as well. In Sherbert v. Verner, *supra,* the Court found that South Carolina had acted unconstitutionally in finding that a Seventh Day Adventist was ineligible for unemployment compensation because her unemployment was due to her refusal of a job that required Saturday labor. As a preliminary to applying the compelling interest analysis

to the State's action, however, the Court found that the State's ruling tended to compel an unemployed woman to choose between following her religion and obtaining work. Recently, in Wisconsin v. Yoder, 1972, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15, the Court found that application of Wisconsin's compulsory school attendance law to the Amish children "would gravely endanger if not destroy, the free exercise of respondents' religious beliefs." *Id.* at 219, 92 S.Ct. at 1535. It then found that no State interest compelled the application.

It is clear to us that the withholding of educational assistance from conscientious objectors imposes a cost that is not nearly of the same order or magnitude as those imposed by the challenged statutes in the cases just mentioned. First, the denial is felt, not immediately, as in *Sherbert,* but at a point in time substantially removed from that when a prospective conscientious objector must consider whether to apply for an exemption from military service. Secondly, the denial does not produce a positive economic injury of the sort effected by a Sunday closing law or ineligibility for unemployment payments. Considering these factors, the court doubts that the denial tends to make a prospective alternate service performer choose between following and not following the dictates of his conscience. Accordingly, we believe that the challenged exclusion does not abridge the plaintiff's free exercise of his religion.

## IV

■ Plaintiff's claim for a judgment declaring not only that the statute is unconstitutional, but also that he and the members of his class are eligible to receive educational assistance benefits, in spite of limiting provisions of 38 U.S.C. §§ 101(21) and 1652(a)(1), raises delicate questions concerning the court's power. There is a paucity of guidance on this question, but in Welsh v. United States, 1970, 398 U.S. 333, 344, 90 S.Ct. 1792, 26 L.Ed.2d 308, Mr. Justice Harlan set forth the principles that we be-

lieve are controlling on this issue. There the Court held that 50 U.S.C. App. § 456(j), which grants an exemption from military service for those persons who by reason of "religious training and belief" are opposed to war, should be construed to cover those whose beliefs were not religiously derived. Mr. Justice Harlan, concurring in the result, was unable to construe the statute in that manner, but, believing that the statute as written contravened the Establishment Clause of the First Amendment, he favored judicial legislation that would include persons whose beliefs derived from "a purely moral, ethical, or philosophical source." *Id.* at 358, 90 S.Ct. at 1806. He noted that where a statute is constitutionally defective because of under-inclusiveness—as is the statute before us—a court might in some circumstances, instead of nullifying the statute entirely, extend it to "include those who are aggrieved by exclusion." *Id.* at 361, 90 S.Ct. at 1808. In making the choice in *Welsh,* Justice Harlan pointed out that the presence of a severability clause was a strong indication that Congress would have a court leave as much of a law intact as possible; he added, however, that the absence of such a clause would not dispose of the possibility of expanding a statute. The test for Mr. Justice Harlan was "to measure the intensity of commitment to the residual policy and consider the degree of potential disruption of the statutory scheme that would occur by extension as opposed to abrogation." *Id.* at 365, 90 S.Ct. at 1810. Applying that test, he found that abrogation would fly in the face of the long history of the conscientious objector exemption, and that extension of the statute to cover persons with nontheistic beliefs could be easily administered by the Selective Service System.

An application of that test here leaves little doubt as to the proper course for us to follow. Educational and vocational assistance benefits have been available to war veterans under various statutory schemes since World War I. The current provisions in chapter 34 reflect Congress's judgment in 1966 that the cold war, Vietnam, and the continuing draft necessitated a reinstitution of the educational assistance program. Inclusion of conscientious objectors who have performed alternate service in the ranks of eligible persons would add but several thousand persons to the millions of veterans now eligible for educational assistance. With this background in mind, the court believes that Congress, if confronted under such circumstances with the alternatives of nullification or extension, would readily choose the latter. Therefore, plaintiff's claim for a declaration of eligibility on behalf of himself and the members of his class is granted. See also United States v. Thirty-Seven Photographs, 1971, 402 U.S. 363, 91 S. Ct. 1400, 28 L.Ed.2d 822; Moritz v. Comm'r, 10 Cir., 1972, 469 F.2d 466.

A final word is necessary concerning the limits of our holding. It does not pertain to the constitutionality of other kinds of veterans' benefits legislation. The various kinds of benefits that are available to veterans obviously involve individual rights, governmental interests and judicial considerations different from those that have guided this court in ruling upon the constitutionality of denying educational assistance to plaintiff and members of his class.

It appearing to the court that the denial of educational benefits to persons who have performed alternate service under 50 U.S.C. App. § 456(j) is not rationally related to the purposes of the educational benefits legislation, an order will enter declaring that 38 U.S.C. §§ 1652(a)(1) and 1661(a) are unconstitutional, and that 38 U.S.C. § 101(21) is unconstitutional with respect to chapter 34 of Title 38, United States Code, because the sections operate to exclude from eligibility persons who have performed alternate service, in violation of the Fifth Amendment to the Constitution of the United States. The order will also declare that plaintiff and the members of his class, who have satisfactorily completed two years of alternate

service or who, after completing 180 days of such service, have been released therefrom upon a determination of a hardship, medical, or other bona fide basis for such early release pursuant to 32 C.F.R. § 1660.10, are to be considered "eligible," within the meaning of 38 U.S.C. § 1652(a)(1), to receive benefits under chapter 34 of Title 38, United States Code, to the same degree and extent as veterans of "active duty"; and alternate service shall be considered "active duty" within the meaning of 38 U.S.C. § 101(21), as applied only to chapter 34 of Title 38.

## DECLARATORY JUDGMENT

This cause came on to be heard upon the complaint of William R. Robison, for himself and all other conscientious objectors similarly situated. The court, upon consideration of the complaint, the plaintiff's motion for summary judgment and defendants' motion to dismiss, and the memoranda of the parties, and after hearing, and for the reasons stated in its opinion filed herewith,

Orders, adjudges and declares:

(1) that 38 U.S.C. §§ 1652(a)(1) and 1661(a) defining "eligible veteran" and providing for entitlement to educational assistance are unconstitutional and that 38 U.S.C. § 101(21) defining "active duty" is unconstitutional with respect to chapter 34 of Title 38, United States Code, 38 U.S.C. §§ 1651–1697, conferring Veterans' Educational Assistance, for the reason that said sections deny plaintiff and members of his class due process of law in violation of the Fifth Amendment to the Constitution of the United States; and

(2) that plaintiff and all members of his class, who have satisfactorily completed two years of alternate service pursuant to 50 U.S.C. App. § 456(j) and regulations thereunder or who, after completing 180 days of such service, have been released therefrom upon a determination of a hardship, medical, 'or other bona fide basis for such early release pursuant to 32 C.F.R. § 1660.10,

shall be "eligible," within the meaning of 38 U.S.C. § 1652(a)(1), to receive benefits under chapter 34 of Title 38, United States Code, to the same degree and extent as veterans of military service; and "alternate service" performed under 50 U.S.C. App. § 456(j) shall be considered "active duty" within the meaning of 38 U.S.C. § 101(21), with respect to chapter 34 of Title 38, United States Code, 38 U.S.C. §§ 1651–1697, and within the meaning of 38 U.S.C. § 1652.