William and Cindy WESTCOTT, Individually and on Behalf of their unborn child and on Behalf of all others similarly situated

v.

Joseph CALIFANO, Sec. HEW and Alexander Sharp, Commonwealth of Mass. Department of Public Welfare.

Civ. A. No. 77–222–F.

United States District Court,
D. Massachusetts.

April 20, 1978.

Mary R. Mannix and Henry A. Freedman, NLSP Center on Social Welfare Policy & Law Inc., New York City, Kenneth P. Neiman, Western Mass Legal Services Inc., Holyoke, Mass., for plaintiff.

John Hanify, Asst. U. S. Atty., Boston, Mass., for Califano, Sec. HEW.

Paul W. Johnson, Asst. Atty. Gen., Boston, Mass., for Comm. Sharp.

OPINION

FREEDMAN, District Judge.

I. *The Claims*

█ This case is before the court on the plaintiffs' motion for partial summary judgment and the federal defendant's cross-motion for summary judgment.[1] The plaintiffs, Cindy and William Westcott and Susan and John Westwood, challenge the constitutionality of § 407 of the Social Security Act, 42 U.S.C. § 607 (hereinafter § 607), a part of the Aid to Families with Dependent Children (AFDC) program, and the implementing Massachusetts welfare regulations, 6 CHSR III, Subch. A, Pt. 301, § 301.03; Pt. 303, Subpt. A, §§ 303.01 & 303.04, which together operate to make available cash assistance (called AFDC–U benefits) and derivatively, through the Medical Assistance Program, medical assistance (called Medicaid benefits) to Massachusetts two parent families with needy children when the father is unemployed. The plaintiffs claim that 42 U.S.C. § 607 is constitutionally offensive because it creates a classification which discriminates against families with children deprived of support or care due to the unemployment of their mother, solely on the basis of sex, in contravention of the plaintiffs' rights to equal protection under the Due Process Clause of the Fifth Amendment to the United States Constitution. Concurrently, the plaintiffs contend that the implementing Massachusetts regulations violate their equal protection rights guaranteed by the Fourteenth Amendment to the federal Constitution insofar as the regulations make families with children deprived of parental support or care because of the unemployment of their mother ineligible for AFDC–U and Medicaid benefits, while providing such aid to similarly situated families where the father is unemployed. The plaintiffs seek both a declaration of the unconstitutionality of § 607 and the implementing Massachusetts regulations and in-

1. The plaintiffs move for partial summary judgment on their first and second claims for relief set forth in their amended complaint, which claims are based on the federal Constitution. The plaintiffs also seek relief against the state defendant based on the Equal Rights Amendment to the Massachusetts Constitution, Mass. Const. Amend. Art. 106, in their amended complaint but have not moved the court for summary judgment on the state constitutional claim.

junctive relief against the continued operation and enforcement of § 607 and the challenged state welfare regulations in an unconstitutional manner by the defendants, Joseph Califano, Secretary of the U.S. Department of Health, Education and Welfare, and Alexander Sharp, Commissioner of the Massachusetts Department of Public Welfare. The plaintiffs state their causes of action under the Civil Rights Act, 42 U.S.C. § 1983, the Declaratory Judgment Act, 28 U.S.C. § 2201, and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* This court has jurisdiction to hear the federal constitutional claim against the federal defendant under 28 U.S.C. § 1331(a) without regard to the amount in controversy. This court also has jurisdiction to entertain the federal constitutional claim against the state defendant under 28 U.S.C. § 1343(3).[2] Both the federal and state defendants oppose the plaintiffs' motion for partial summary judgment. The federal defendant has made his cross-motion for summary judgment on the ground that § 607 is constitutionally permissible.

Also pending before the court is the plaintiffs' motion for certification of this case as a class action. The named plaintiffs purport to represent a class of Massachusetts two parent families with minor dependent children who would otherwise be eligible to receive AFDC–U and derivatively Medicaid benefits but for the limitation in the federal statute and Massachusetts regulations which permits federally funded AFDC–U and Medicaid benefits to be provided to families deprived of support due to the fathers' unemployment but not to families deprived of support because of the unemployment of the mothers.

For the reasons stated below, the court grants the plaintiffs' motion for class certification. The court also finds that 42 U.S.C. § 607 and the implementing Massachusetts regulations are unconstitutional. The plaintiffs' motion for partial summary judgment is, therefore, granted and the federal defendant's cross-motion for summary judgment denied.

## II. The Statutory and Regulatory Scheme

The Aid to Families with Dependent Children program, one of the public assistance programs established by the Social Security Act of 1935, represents a cooperative effort by the federal and state governments to provide financial assistance and social services to families with needy dependent children. 42 U.S.C. § 601. *See generally Rosado v. Wyman,* 397 U.S. 397, 407–09, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); *King v. Smith,* 392 U.S. 309, 316–17, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). A state's participation in the AFDC program is voluntary. If a

**2.** As the state constitutional claim against the state defendant is not before the court at this time, the court expresses no opinion on whether there is pendent jurisdiction over that claim. The court also notes that this case does not present the "narrowly limited 'special circumstances,'" *Zwickler v. Koota,* 389 U.S. 241, 248, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967), *quoting Propper v. Clark,* 337 U.S. 472, 492, 69 S.Ct. 1333, 93 L.Ed. 1480 (1949), for a federal court to abstain from exercising jurisdiction over the federal constitutional claims. A state court decision declaring the state regulations void on state constitutional grounds would not avoid or moot the federal constitutional claim against the federal defendant—which is, in essence,— that it is the federal policy of limiting financial assistance, in the form of matching funds for state paid benefits, on a gender basis that the state is implementing when it denies AFDC–U and derivatively Medicaid benefits on the basis of sex, and that this federal financial assistance, like other government benefits, cannot be

made available on the impermissible basis of sex. Furthermore, since this federal constitutional claim cannot be avoided, and the federal constitutional claim of sex discrimination in violation of the Fourteenth Amendment against the state defendant is identical to the Fifth Amendment claim against the federal defendant, *see* note 10 *infra,* this is not a case where "evaluation . . . under the state constitution may obviate any need to consider . . . validity under the Federal Constitution." *Reetz v. Bozanich,* 397 U.S. 82, 85, 90 S.Ct. 788, 789, 25 L.Ed.2d 68 (1970), *quoting Meridian v. Southern Bell T. & T. Co.,* 358 U.S. 639, 641, 79 S.Ct. 455, 3 L.Ed.2d 562 (1959) (per curiam). *See also Examining Bd. of Engineers, Architects & Surveyors v. Flores de Otero,* 426 U.S. 572, 598, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976), where abstention was thought improper despite the fact that a Puerto Rican statute being challenged under the Fourteenth Amendment might have violated the "broad and sweeping" provisions of the Puerto Rico Constitution.

state elects to make AFDC payments, however, the state must comply with the federal statutory requirements set forth in 42 U.S.C. § 602(a) and the relevant federal regulations, and the state plan must be approved by the Secretary of Health, Education and Welfare, 42 U.S.C. § 602, in order for the state to qualify for federal reimbursement of a percentage of its expenditures. 42 U.S.C. § 603.[3]

Under the AFDC program, the federal government will only contribute for aid given by the states to families whose children come within the statutory definition of "dependent." Section 606(a) of Title 42 describes a "dependent" as a "needy child . . . who has been deprived of parental support or care by reason of the death, continued absence from the home, or physical or mental incapacity of a parent . . . ." *Id.* A further definition of "dependent" is contained in 42 U.S.C. § 607(a): "a needy child . . . who has been deprived of parental support or care by reason of the unemployment (as determined in accordance with standards prescribed by the [HEW] Secretary) of his father . . . ." *Id.* Section 607(b) sets forth some of the federal standards for the unemployment of the father: the father must be unemployed under the HEW Secretary's standards for at least 30 days, 42 U.S.C. § 607(b)(1)(A); the father has not refused a bona fide offer of employment or training within that period, *id.* § 607(b)(1)(B); and the father has a prior attachment to the work force or received or was qualified to receive unemployment compensation, *id.* § 607(b)(1)(C). It is thus the § 607 definition of "dependent" that creates the AFDC-unemployed fathers (AFDC–U) subprogram and, in conjunction with other provisions of the Act, permits federal funding of benefits provided by the states to families with children deprived of support because of the father's

unemployment.[4] *See generally Batterton v. Francis*, 432 U.S. 416, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977).

As is the case with respect to the AFDC program, state participation in the federal-state Medicaid program is voluntary. If a state opts to participate in the Medicaid program, and the state plan is approved by the Secretary of Health, Education and Welfare, under 42 U.S.C. § 1396a(b), then, the state is provided federal reimbursement of a percentage of the cost of benefits expended on eligible individuals. 42 U.S.C. §§ 1396b and 1396d(b). The coverage of the Medicaid program is derived, at least in part, from the coverage of other public assistance programs including the AFDC program. Hence, families who receive AFDC–U benefits are among the individuals entitled to receive Medicaid benefits. 42 U.S.C. § 1396a(a)(10). A federal regulation further allows families who are eligible for AFDC benefits but have not applied for cash assistance to be considered eligible for Medicaid benefits if their state chooses to give them medical coverage. *See* 45 C.F.R. § 248.1(a)(1) & (c). The limitation of federal funding to benefits paid to families with needy children deprived of support because of the father's unemployment embodied in the AFDC program is, thus, carried over into the Medicaid program.

The State of Massachusetts has elected to make AFDC payments and provide Medicaid coverage to families with children deprived of parental support or care because of the father's unemployment, 6 CHSR III, Subch. A, Pt. 301, § 301.03; Pt. 303, Subpt. A, §§ 303.01 & 303.04; Mass.Public Assistance Policy Manual, Ch. 1, Section F, Subd. a, including unborn children, 6 CHSR III, Subch. A, Pt. 301, § 301.05. In 1976, Massachusetts was one of the 28 states with an approved plan providing AFDC–U benefits,

---

**3.** Although state plans must be approved by the Secretary of Health, Education and Welfare, 42 U.S.C. § 602, the participating states are given the discretion to determine the level of benefits as well as the standard of need. *See Shea v. Vialpando*, 416 U.S. 251, 253, 94 S.Ct. 1746, 40 L.Ed.2d 120 (1974), and cases cited therein.

**4.** The Act provides that AFDC benefits include payments to meet the needs of both parents, in the case of children deprived of support occasioned by the incapacity of a parent or the unemployment of a father. 42 U.S.C. § 606(b).

*see* Answer of the federal defendant to amended complaint ¶ 10 at 2, and Massachusetts continued to participate in the AFDC–U program and to provide AFDC–U payments in 1977. *See* Dept. of HEW, Public Assistance Statistics, Feb. 1977, table 5, p. 8. (1977). The federal reimbursement rate established for the period from July 1, 1975 to June 30, 1977 for Massachusetts was 50% for both AFDC and medical assistance benefits. *See* 39 Fed.Reg. 33020 (1974).

Although a Massachusetts statute currently in effect defines a "dependent" for purposes of the AFDC program as *inter alia*, "a needy child who has been deprived of parental support or care by reason of . . . the unemployment of a parent," Mass.Gen.Laws Ann. c. 118, § 1, and, consequently, would permit AFDC and derivatively Medicaid benefits to be provided to families with needy children deprived of support because of the mother's unemployment, the state welfare regulations implement the federal policy of limiting such aid to families with an unemployed father. 6 CHSR III, Subch. A, Pt. 301, § 301.03; Pt. 303, Subpt. A, § 303.01. Massachusetts has also elected to provide Medicaid to families who are eligible for AFDC but have not applied for cash assistance. Mass.Public Assistance Policy Manual, Ch. I, § F, Subd. 2a. In keeping with the federal policy, Massachusetts does not provide AFDC or Medicaid benefits to families with children deprived of support because of the mother's unemployment.

## III. *Factual Background*

The following facts are undisputed:

Plaintiffs Cindy and William Westcott are married, reside in Massachusetts, and have an infant son who was born on June 18, 1977. Cindy Westcott, age 20, has been employed at various full-time and part-time jobs since 1972. Her last job was as a chambermaid which she held from May 1976 to November 1976, and from which she earned approximately $50 per week. William Westcott, age 18, worked at various temporary odd jobs during the course of 1976.

In November 1976, the Westcotts applied for public assistance at the Springfield office of the Department of Public Welfare. The Westcotts were denied AFDC–U benefits by a written notice dated November 26, 1976, which stated that William Westcott did not have sufficient quarters of work to satisfy the definition of an unemployed father as required by 6 CHSR III-303, Subpt. A, § 303.04.[5] After this lawsuit was filed, pursuant to a stipulation between the Westcotts' attorney and the attorney for the state defendant, the Westcotts' eligibility for AFDC was redetermined. In February 1977, the Department of Public Welfare determined that the Westcotts satisfied all conditions of eligibility for AFDC–U except the condition that the unemployed parent be male. Based on her work history, Cindy Westcott was found to meet the definition of "unemployed" except for the fact that she is female. That Cindy Westcott meets the definition of unemployed was sufficient, pursuant to the stipulation, for the Westcotts to be granted AFDC–U. They were provided AFDC–U benefits retroactive to November 1976, and pursuant to the stipulation, they continue to receive AFDC–U benefits based on their continued eligibility but for the requirement that the unemployed parent be male.

Plaintiffs Susan and John Westwood are married, reside in Massachusetts, and have a son who was two years old in April 1977. Since 1972, plaintiff Susan Westwood has worked part-time as a bookkeeper. She works about 10 to 15 hours per week and, from 1976 on, earned a "take-home" pay of about $66 weekly. From January 1973 on, plaintiff John Westwood's only employment was maple sugaring for two months in 1973 and maple sugaring and logging for five months in 1974.

In February 1977, Susan and John Westwood applied for Medicaid benefits. By

---

**5.** The Westcotts were orally informed that they were not eligible for general relief either as a family or individually. On December 29, 1976,

Cindy Westcott received a Medicaid card because she was eligible as a needy individual under 21.

letters dated March 2, 1977, the Westwoods were denied Medicaid benefits because (1) neither was incapacitated so as to qualify them for MA–DA (Medicaid benefits for the disabled), and (2) John Westwood did not meet the definition of an unemployed father because of his insufficient work history.[6] In September 1977, the Westwoods' attorney and the state's attorney entered into a stipulation pursuant to which Massachusetts considered the Westwoods' eligibility for Medicaid benefits by applying all the Medicaid eligibility requirements for families who are eligible for AFDC–U except the requirement that the unemployed parent be male. By letter dated October 5, 1977, the Westwoods were notified by the Department of Public Welfare that they had been determined eligible to receive Medicaid. They are presently receiving only Medicaid based on their continuing eligibility but for the requirement that the unemployed parent be male.

■ The agreed upon facts, thus, paint the picture of two Massachusetts families with both parents present and the mother the primary wage earner who is currently unemployed within the meaning of § 607 and the implementing state welfare regulations. The families have been determined eligible to receive AFDC–U or Medicaid benefits except for the gender requirement that the unemployed parent be male. As the parties have left no genuine issue of material fact in respect to the plaintiffs' claims before the court on this motion, partial summary judgment is appropriate at this juncture. Fed.R.Civ.P. 56(a) & (c). The summary judgment procedure is the proper vehicle for disposing of constitutional questions where an adequate factual record has been presented. *See Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); 6 Moore's Federal Practice ¶ 56.17[10], at 56–772–76 (2d ed. 1976).

## IV. *Class Action*

Before reaching the merits of the plaintiffs' equal protection claims, the court will first take up the plaintiffs' motion for certification of this action as a class action under Rule 23(a) and Rule 23(b)(2), Fed.R. Civ.P. The class sought to be certified is:

those Massachusetts families with two parents in the home and with minor dependent children, born or unborn, who would otherwise be eligible for AFDC under Massachusetts' AFDC program, and hence Medicaid as well, but for the sex discrimination in the federal statute [42 U.S.C. § 607] and Massachusetts regulations [6 CHSR III, Subch. A, Pt. 301, § 301.03; Pt. 303, Subpt. A, §§ 303.01 & 303.04] which provide for the granting of federally funded AFDC and Medicaid to families deprived of support because of the unemployment of their father, but not to families deprived of support because of the mother's unemployment.

Both the federal and state defendants oppose class certification. In order for the named plaintiffs to represent the proposed class, they must demonstrate that the requirements of Rule 23(a) have been met:

(1) the class is so numerous that joinder of all members is impracticable,

(2) there are questions of law or fact common to the class,

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and

(4) the representative parties will fairly and adequately protect the interests of the class.

The first of these requirements presents the most difficult hurdle for the plaintiffs to surmount. The plaintiffs support their claim that their class is "so numerous as to make joinder impracticable" by the presentation of the records of the Department of Public Welfare showing that numerous families have been denied AFDC–U benefits because the father did not meet the definition of unemployed. The plaintiffs then ask the court to draw the reasonable inference that a substantial number of the Massachusetts families denied AFDC–U be-

---

6. *The Westwoods' child receives Medicaid as a needy individual under 21.*

cause the father did not satisfy the definition of unemployed have mothers who would satisfy that definition. Such a conclusion, the plaintiffs contend, can reasonably be reached on the basis of labor data which suggests that there are a substantial number of low income Massachusetts two parent families with children in which the father is not in the labor force, but the mother is, who would qualify for AFDC–U if the mother is either underemployed or unemployed. The plaintiffs point out that there is no practical method for identifying class members or computing their numbers as the Massachusetts Department of Public Welfare does not compile information concerning the mother's employment history for those two parent families denied AFDC–U benefits on the ground that the father does not fulfill the definition of unemployed.

■ While courts have indicated that "a bare allegation of numerosity founded upon mere conjecture as to the size of the class does not satisfy the requirements of Rule 23(a)(1)," *Kinsey v. Legg, Mason & Company, Inc.,* 60 F.R.D. 91, 100 (D.D.C. 1973) and cases cited therein, a court may draw reasonable inferences about the size of the class from the facts before it. *Doe v. Flowers,* 364 F.Supp. 953, 954 (N.D.W.Va. 1973) (per curiam), *aff'd mem.* 416 U.S. 922, 94 S.Ct. 1921, 40 L.Ed.2d 279 (1974); *Senter v. General Motors Corp.,* 532 F.2d 511, 523 (6th Cir.), *cert. denied,* 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976). "The fact that the exact number of the class cannot be enumerated does not bar certification," *Lund v. Affleck,* 388 F.Supp. 137, 139–40 (D.R.I.1975), and "[I]t is not necessary that the members of the class be so clearly identified that any member can be presently ascertained." *Carpenter v. Davis,* 424 F.2d 257, 260 (5th Cir. 1970). It is also evident from the diversity of judicial decisions pertaining to the numerical cutoff for class membership required in order to satisfy Rule 23(a)(1), *see* 3B Moore's Federal Practice ¶ 23.05 at 23–272–74 (2d ed. 1976), that a numerical yardstick is not the determinant for class certification, rather "whether or not the numbers make joinder impracticable . . . is the test." *Dale Electronics, Inc. v. R.C.L. Electronics, Inc.,* 53 F.R.D. 531, 534 (D.N.H.1971) (per Bownes, J.); *see also Walls v. Bank of Greenwood,* 20 F.R.Serv.2d 112, 113 (N.D.Miss.1975).

■ Keeping these authorities in mind, the court finds that the plaintiffs have made a showing that their class is so numerous that joinder is impracticable. The most recent records supplied by the Massachusetts Department of Public Welfare to the plaintiffs reveal that from November 1976, when the Westcotts applied for benefits, to July 1977, the number of families denied AFDC–U on the ground that the father did not meet the definition of unemployed was 135. Thirteen more families within the same period were refused AFDC–U benefits because the child was not deprived of parental support or care.[7] These 148 families constitute a pool of likely class members. Further, when the labor force participation of Massachusetts married women with children is considered together with recent unemployment statistics, it may also reasonably be concluded that numerous class members exist.[8] Since the

---

7. *See* Applications Reports, Massachusetts Department of Public Welfare, Division of Statistics, for months of November 1976, December 1976, January 1977, February 1977, March 1977, April 1977, May 1977, June 1977, July 1977 (attached to Plaintiffs' Supplemental Memorandum in Support of Plaintiffs' Proposed Findings with Respect to the Class and in Response to Defendants' Opposition to Class Certification). Deprivation of parental support according to a state regulation may result from the unemployment of the father, 6 CHSR III, Subch. A, Pt. 303, Subpt. A, § 303.01, so that families denied AFDC–U on the ground that the

child was not deprived of parental support or care should also be taken into account.

8. A substantial proportion of Massachusetts women work. Data compiled with respect to the year 1970 indicates that 45% of all Massachusetts women were workers, and 51% of these Massachusetts women workers were married and living with their spouses. Also, in 1970, 39% of Massachusetts mothers living with their own children were in the labor force. Employment Standards Administration, Women's Bureau, U.S. Dept. of Labor, Women Workers in Massachusetts, 1970 1–2 (1973). In

plaintiffs describe the proposed class as those who would otherwise be eligible for AFDC–U and Medicaid benefits but for the sex requirement, the class membership would include families who have not formally applied for and been denied the benefits but have been discouraged from applying because of the requirement that the unemployed parent be male and not female. *Cf. Cypress v. Newport News General & Nonsectarian Hosp. Ass'n,* 375 F.2d 648, 652–53 (4th Cir. 1967).

The plaintiffs' inability to identify class members, moreover, buttresses their contention that joinder is impracticable. As the Fourth Circuit stated in *Doe v. Charleston Medical Center, Inc.,* 529 F.2d 638, 645 (4th Cir. 1975), "[w]here the plaintiff has demonstrated that the class of persons he or she wishes to represent exists, that they are not specifically identifiable supports rather than bars the bringing of a class action, because joinder is impracticable." *See also Jack v. American Linen Supply Co.,* 498 F.2d 122, 124 (5th Cir. 1974). The court also notes that the relief the plaintiffs are seeking is injunctive and declaratory in nature. Where such limited relief is sought, the requirement that the class is so numerous as to make joinder impracticable has been relaxed. *See Doe v. Flowers, supra* at 954.

█ In respect to the other requirements of Rule 23(a)(2), (3) and (4), the court finds that the question of law common to the class is whether the defendants have violated the class members' rights to equal protection guaranteed by the Fifth and Fourteenth Amendments to the Federal Constitution by not providing AFDC–U and/or Medicaid benefits to needy two parent families deprived of support because of a mother's unemployment. The claims of the Westcotts and Westwoods are typical of the claims of the class members. It appears that Cindy and William Westcott and John and Susan Westwood will fairly and adequately protect the interests of the class as their interests in receiving AFDC–U and/or Medicaid benefits are identical to the interests of the other members of the class. In addition, the named plaintiffs are represented by attorneys experienced in welfare law.

The instant case is, likewise, an appropriate one for class certification under Rule 23(b)(2) which requires that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." The First Circuit has described Rule 23(b)(2) as "uniquely suited to civil rights actions in which the members of the class are often 'incapable of specific enumeration.'" *Yaffe v. Powers,* 454 F.2d 1362, 1366 (1st Cir. 1972), and has recently indicated that Rule 23(b)(2) actions "may be more rough-hewn than those in which the court is asked to award damages. . . ." *Griffin v. Burns,* 570 F.2d 1065, 1074 (1st Cir. 1978).

1976, 49.9% of the Massachusetts women of age 20 and above were in the civilian labor force. Bureau of Labor Statistics, U.S. Dept. of Labor, Geographic Profile of Employment and Unemployment, 1976, Report 504, Table 3 at 15 (1977). In addition, there is statistical evidence that there have been many low income Massachusetts two parent families with infant children where the wife and not the husband was in the labor force. See U.S. Bureau of Census, Census of the Population: 1970, Vol. 1, Characteristics of the Population, Part 23, Massachusetts, Table 209, which indicates that in 1969 the families with an income below poverty level where the husband (under age 65) was not in the labor force and wife was in the paid labor force and children under age 6 in the household numbered 346. *Id.*

Recent national data on the unemployment of working wives suggests that a significant portion of married, working women with children under age 18 may be unemployed. In March 1975, the unemployment rate of married women was considerably higher than that for married men: 8.5% for married women as compared to 6.1% for married men. The unemployment rate for wives was highest for those with children under three years old, 16.5%, while it was lowest for wives without any children under age 18, 1.0%. Bureau of Labor Statistics, U.S. Dept. of Labor, Monthly Labor Review, "Marital and Family Characteristics of the Labor Force, March 1975," 52 (November 1975). In March 1975, there were 1,118,000 married women with a husband present and children under age 18 who were unemployed. *Id.* at 53, Table 2.

Certainly the drafters of Rule 23(b)(2) planned that the rule would cover civil rights actions where a party is allegedly discriminating unlawfully against a class whose members could not be specifically enumerated. *See* Committee's Notes to Revised Rule 23, 3B Moore's Federal Practice ¶ 23.01 [10.–2] at 23.28 (2d ed. 1977). As the present case involves alleged discriminatory conduct by the state and federal governments against families who cannot be specifically identified, and final injunctive and declaratory relief is appropriate, this action may properly be maintained as a Rule 23(b)(2) class action.

■ The court, furthermore, wishes to express its disagreement with the federal defendant's argument advanced in opposition to class certification that a class action is neither useful nor necessary where the relief sought is declaratory and injunctive in character and would operate to bar defendant from continuing the challenged conduct. There is no language in Rule 23(b)(2), as there is in Rule 23(b)(3), that requires the court to consider the necessity of a class action for adjudication of the case, and the Rule 23(b)(3) command that a class action be "superior to other available methods for the fair and efficient adjudication of the controversy," should not be imported into Rule 23(b)(2). *Cf. Yaffe v. Powers, supra* at 1366. Other courts have recently found that class certification was the proper course to follow in the face of similar claims by defendants that certification was unnecessary. In *Hoehle v. Likins,* 538 F.2d 229 (8th Cir. 1976), *rev'g in part,* 405 F.Supp. 1167 (D.Minn.1975), for example, which involved a challenge to a state's AFDC "flat grant" allocation system, the Eighth Circuit reversed the denial of class certification by a federal district court. 538 F.2d at 231. Although the requirements for a class action had been satisfied, the district court had erroneously refused to grant class action status because the relief would have been identical and have benefitted the pro-

posed class members without class certification. 405 F.Supp. at 1175. *See also Mendoza v. Lavine,* 72 F.R.D. 520, 523 (S.D.N.Y. 1976). One Court of Appeals has perhaps gone a step farther and indicated that where Rule 23 requirements have been fulfilled, a court may not deny class certification. *Fujishima v. Board of Education,* 460 F.2d 1355, 1360 (7th Cir. 1972); *see also Driver v. Helms,* 74 F.R.D. 382, 405 n. 27 (D.R.I.1977). Although this court declines to take that additional step, because the wording of Rule 23(b) suggests that certification is to some extent discretionary,[9] *Schneider v. Margossian,* 349 F.Supp. 741 (D.Mass.1972) (Supp.Mem. and Order), I recognize that class action status may afford class members protection against the risk of mootness of the named plaintiff's claim, *Sosna v. Iowa,* 419 U.S. 393, 399, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975); *Hoehle v. Likins,* 538 F.2d at 231; *Morales v. Minter,* 393 F.Supp. 88, 91 n. 5 (D.Mass.1975), and may facilitate the enforcement of a favorable judgment where a defendant fails to comply with a court order. *See, e. g., Class v. Norton,* 505 F.2d 123 (2d Cir. 1974); *Kilfoyle v. Heyison,* 417 F.Supp. 239, 243 (W.D. Pa.1976). Hence, class certification is not an empty formality, even in a case where declaratory and injunctive relief would automatically inure to the benefit of those similarly situated with the plaintiffs. Accordingly, the plaintiffs' motion to proceed as a class action is granted.

## V. *Equal Protection*

■ At last the court reaches the plaintiffs' equal protection claims. The plaintiffs allege that § 607 and the Massachusetts implementing regulations which govern the availability of AFDC and Medicaid benefits to two parent families create a gender based classification, as the difference between those two parent families who are eligible to receive AFDC–U benefits and those ineligible is the sex of the unemployed parent. If the father in a two parent family otherwise eligible meets the

---

**9.** Rule 23(b) provides that "[a]n action *may* be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition: . . . ." Fed.R.Civ.P. 23(b) (emphasis added).

definition of unemployed, then his family may receive the benefits. In contrast, if the mother in a two parent family otherwise eligible satisfies the definition of unemployed, her family may not. This court heartily agrees that the statutory and regulatory distinction, thus established, is gender based. It is certainly as much a sex-based classification as those legislative distinctions which have been made between widows and widowers, recognized in *Weinberger v. Wiesenfeld,* 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975), and husbands and wives, in *Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973).

Such a gender based classification is subject to scrutiny under the equal protection principles embraced in the Fifth Amendment's Due Process Clause and the Fourteenth Amendment's equal protection guarantee.[10] *Reed v. Reed,* 404 U.S. 71, 75, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971); *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). Beginning with the 1971 decision in *Reed v. Reed, supra,* the United States Supreme Court has upheld many claims of sex discrimination in violation of equal protection principles.[11] A significant number of claims of discrimination on the basis of gender, however, have also been rejected by the Supreme Court mainly on the rationale that such gender classifica-

tions were compensatory for women, first expressed in *Kahn v. Shevin,* 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974).[12] Despite this burgeoning case law, the standard of review of gender based classifications has not been altogether clear.

In *Reed, supra,* 404 U.S. at 76, 92 S.Ct. at 254, wherein a unanimous court struck down an Idaho statutory provision which gave a mandatory preference to males over females for appointment as administrators of estates of persons dying intestate, Justice Burger employed a vigorous rational basis standard: "A classification 'must be reasonable, not arbitrary; and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' *Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920)." Although, two years after the *Reed* decision, four members of the Court in *Frontiero v. Richardson, supra,*[13] indicated their willingness to recognize sex as a suspect classification, which, like race, national origin and alienage, would require strict judicial scrutiny, a majority of the Court has apparently declined to do so. *Stanton v. Stanton,* 421 U.S. 7, 13, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975). *See Fortin v. Darlington Little League, Inc.,* 514 F.2d 344, 348 (1st Cir. 1975).

**10.** Although the Fifth Amendment does not contain an equal protection clause, the Fifth Amendment's guarantee of due process has been interpreted to forbid discrimination that is "so unjustifiable as to be violative of due process." *Schneider v. Rusk,* 377 U.S. 163, 168, 84 S.Ct. 1187, 1190, 12 L.Ed.2d 218 (1964), quoting *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954). Moreover, the Supreme Court's approach to equal protection claims under the Fifth Amendment has mirrored that under the Fourteenth Amendment. *Weinberger v. Wiesenfeld, supra,* 420 U.S. at 638, n. 2, 95 S.Ct. 1225.

**11.** *See, e. g., Frontiero v. Richardson, supra; Weinberger v. Wiesenfeld, supra; Stanton v. Stanton,* 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975); *Craig v. Boren, supra; Califano v. Goldfarb,* 430 U.S. 199, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977).

**12.** *See, e. g., Schlesinger v. Ballard,* 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975); *Cali-*

*fano v. Webster,* 430 U.S. 313, 97 S.Ct. 1192, 51 L.Ed.2d 360 (1977). *See also Geduldig v. Aiello,* 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974), in which the Court declined to find that the provision of California's disability insurance plan which excepted from coverage disability resulting from normal pregnancy violated the equal protection clause. The Court refused to view *Aiello* as a sex discrimination case. *Id.* at 496, n. 20, 94 S.Ct. 2485.

**13.** In *Frontiero,* a majority of the Court found unconstitutional the federal statutory scheme that provided the wife of a male member of the uniformed services certain dependents' benefits without proof of actual dependency, but did not provide the same benefits to the husband of a female member of the uniformed services except upon proof that she actually provided more than one-half of her husband's support. 411 U.S. at 691, 93 S.Ct. 1764.

More recently, in *Craig v. Boren, supra,* the Supreme Court enunciated an intermediate standard of review for determining whether a gender based classification abridges equal protection rights under the Fifth or Fourteenth Amendments. Relying on the *Reed* opinion and succeeding cases, Justice Brennan, who wrote the opinion of the Court in *Craig,* stated that, in order to survive an equal protection challenge, "classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." 429 U.S. at 197, 97 S.Ct. at 457. Employing this standard in *Craig,* the Court held that the sex based distinction in Oklahoma's 3.2 beer statute, which prohibited the sale of "non-intoxicating" liquor to males under the age of 21 and to females under 18, denied males aged 18–20 equal protection of the laws. Although only four members of the Court subscribed to the intermediate standard for equal protection analysis in *Craig,* five members of the Court apparently adopted the *Craig* test in a subsequent case in which the Court reviewed a gender classification in the Social Security Act, *Califano v. Webster,* 430 U.S. 313, 97 S.Ct. 1192, 51 L.Ed.2d 360 (1977).[14] The *Craig* standard would, thus, appear to be the prevailing standard of review of sex based classifications although the vigorous rational basis test of *Reed* has not been clearly differentiated from the *Craig* standard. *See Meloon v. Helgemoe,* 564 F.2d 602–05 & n. 3 (1st Cir. 1977).

In applying the *Craig v. Boren* standard in this case, the court will first identify the important governmental objectives of the legislation being challenged. Then, as a second step, the court will determine whether the divergent treatment accorded the sexes by the legislation can fairly be said to serve these objectives. Under this two step approach, this court reaches the conclusion that the gender based classification embodied in 42 U.S.C. § 607 and the implementing Massachusetts regulations cannot withstand an equal protection attack.

█ In taking the first step, a review of the legislative history and changes in the statutory language demonstrates that the important governmental objectives of the AFDC program and the AFDC–U segment are the protection and care of needy children in families without a breadwinner's support and the maintenance of family structure and stability. *Cf. Ramos v. Montgomery,* 313 F.Supp. 1179, 1181 (S.D.Cal. 1970), *aff'd,* 400 U.S. 1003, 91 S.Ct. 572, 27 L.Ed.2d 618 (1971). The paramount congressional concern that motivated the enactment of the Social Security legislation including the passage of the Aid to Dependent Children program, the forerunner name of the AFDC program, was the welfare of children in the aftermath of the depression. A Senate Report on the proposed Social Security bill declared that the "heart of any program for social security must be the child. . . . Children are in many respects the worst victims of the depression." S.Rep.No.628, 74th Cong., 1st Sess. 16–17 (1935). *See also* H.R.Doc.No.615, 74th Cong., 1st Sess. 9–10 (1935); Message of the President Recommending Legislation on Economic Security, House Doc.No.81, 74th Cong., 1st Sess. 29 (1935). However, because Congress believed that many children were in need as a result of the unemployment of the breadwinner in the family, and that these children would be "benefited through the work relief program and still more through the revival of private industry," S.Rep.No.628, 74th Cong., 1st Sess. 17 (1935), the coverage of the Aid to Dependent Children Program did not include families of the unemployed but was initially

---

**14.** In *Craig,* the four members of the Court who subscribed to the intermediate standard were Justices Brennan, White, Marshall and Blackmun. In *Califano v. Goldfarb,* 430 U.S. 199, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977), decided within three months after *Craig,* four members of the Court again joined in an opinion endorsing the use of the *Craig* test, but it was a different four members, Justices Brennan, White, Marshall and Powell. *Califano v. Webster, supra,* which closely followed *Goldfarb,* was a unanimous decision. The *per curiam* opinion employed the *Craig* test, and only four members of the Court joined in a separate opinion concurring in the judgment which did not apply the *Craig* test.

limited to families with at least one parent deceased, absent from the home or incapacitated. Social Security Act § 406, 49 Stat. 629 (1935). Those persons who the Aid to Dependent Children Program was originally designed to protect were described as the "fatherless and other 'young' families without a breadwinner." Message of the President on Economic Security, House Doc. No.81, 74th Cong., 1st Sess. 4 (1935).

In 1961, Congress enacted the legislation that extended the program's aid on a temporary basis to needy children who were dependent as a result of the unemployment of a parent. Social Security Act § 407, 75 Stat. 75 (1961). *See* H.R.Rep.No.28, 87th Cong., 1st Sess. 1–2 (1961). The debates in Congress concerning the expansion of the program's coverage indicate that the overriding goal of the temporary legislation was the care and protection of the needy child who had been deprived of his economic and social well being because of the involuntary unemployment of the "breadwinner" in the family. *See, e. g.*, 107 Cong.Rec. 3759 (remarks of Rep. Lane); 107 Cong.Rec. 3761 (remarks of Rep. Mills, sponsor of the Bill); 107 Cong.Rec. 3761–62 (remarks of Rep. Perkins); 107 Cong.Rec. 3767 (remarks of Rep. Byrnes); 107 Cong.Rec. 3768 (remarks of Rep. McCormack); 107 Cong.Rec. 6401 (remarks of Sen. McCarthy). The actual statutory language used by Congress to expand coverage of the program was sex-neutral as the term "dependent" was given the additional definition of a needy child "who has been deprived of parental support or care by reason of the unemployment . . . of a *parent.*" Social Security Act § 407, 75 Stat. 75 (1961) (emphasis added).[15]

A second legislative goal which Congress had in mind when it created the legislation providing for aid to needy children of unemployed parents was the stability of the family. By providing assistance to families with both parents present, where one was unemployed, Congress hoped to counteract the incentive for desertion and, in particular, the incentive for the real or pretended desertion of fathers, inherent in a program where assistance was available in the event of the absence from the home of a parent. *See* H.R.Rep.No.28, 87th Cong., 1st Sess. 2 (1961). This goal was reiterated in respect to the 1962 legislation which extended for five years the temporary unemployed parents segment of the program. Social Security Act § 401 *et seq.*, 76 Stat. 185 (1962); *see* H.R.Rep.No.1414, 87th Cong., 2d Sess. 9 (1962). The goal of family stability evident from the legislative history of § 607 was consistent with one of the stated objectives of the entire program set forth in 42 U.S.C. § 601 "to help maintain and strengthen family life." *Id.*

15. The legislators at times during the Congressional debates used the term "father" interchangeably with the terms "breadwinner," "worker" and "wage earner." This usage apparently reflected their belief that the father is generally the primary wage earner of the family and the mother the "homemaker." The legislators, however, did not limit the coverage of the statute on a gender basis as the statutory term used was "parent," a sex-neutral one, and not "father." It is also noteworthy that coverage of children deprived of parental support or care because of maternal as well as paternal unemployment was contemplated. *See, e. g.*, 107 Cong.Rec. 3763 (remarks of Rep. Doyle).

If we underestimate at all, we make a mistake in not estimating the very serious psychological, as well as economical, result this clear situation of continuing and increasing unemployment has upon the minor children in these millions of homes. . . . Not least of all, where the usual breadwinner is forced to be idle is the spirit, is the ambition, is the understanding of the minor children tarnished, weakened and in many cases caused to be seared with a lack of understanding as to why it should be necessary for his *father*, or his *mother*, to be unable to earn when that *father*, or that *mother*, that *breadwinner*, is entirely willing to go to work to support his or her own minor children and keep them in school. . . .

. . . For, I am sure, I only have to briefly mention that as the present children and youth of our Nation are raised, and, as the conditions under which they are raised will largely help to determine not only their character as they grow older, but the ultimate worth and value to our Nation of these children, for whom there is need in the homes of America where there is continuing involuntary unemployment by the homes' breadwinners, it is absolutely imperative . . . that the hazards and destructions in such homes, thus caused, shall be terminated at the earliest possible date.

*Id.* (emphasis supplied).

It was only in 1968 when Congress decided to make the AFDC–U program permanent, as part of an overhaul of the Social Security Act, that it fashioned legislation along gender lines. A dependent was redefined as a needy child deprived of parental support or care by reason of the *father's* unemployment. Social Security Act § 407(a), 81 Stat. 882 (1968). The legislative reports revealed that Congress deliberately created the gender distinction so as to exclude families with unemployed mothers from the program's coverage. The House Report stated:

> This program was originally conceived as one to provide aid for the children of unemployed fathers. However, some States make families in which the father is working but the mother is unemployed eligible. The bill would not allow such situations. Under the bill, the program could apply only to the children of unemployed fathers.

H.R.Rep.No.544, 90th Cong., 1st Sess. 108 (1967); *see also* S.Rep.No.744, 90th Cong., 1st Sess. 160 (1967), U.S.Code Cong. & Admin.News 1967, p. 2834. No clear explanation for the redefinition, however, was offered so that despite the gender change in the legislative language the important governmental objectives of the AFDC and AFDC–U legislation apparently remained unchanged.

■ Turning to the second step under the *Craig v. Boren* standard, the Court finds that the gender distinction inserted in § 607 and carried over into the implementing Massachusetts welfare regulations does not serve the important governmental objectives of the AFDC program and its AFDC–U segment. First, the sex based distinction does not further the important governmental objective of providing financial assistance to families with needy children who are without the support of a breadwinner, and in particular, to those families where the breadwinner becomes unemployed and is unable to provide for their economic well being. In denying assistance when the female working parent becomes unemployed, many families with needy children, the targets of the AFDC program, go unaided. Indeed, in view of the legitimate legislative goal of assisting families with needy children without a breadwinner's support, the sex based differentiation in § 607 and the implementing Massachusetts regulations is irrational. It creates two groups of two parent families with needy children who are without support because the wage earner is unemployed: one group where the wage earner is male, and a second where the wage earner is female. The first group may receive AFDC–U and Medicaid benefits, but the second may not.

Secondly, the important governmental objective of family stability is not served but rather is thwarted by the sex based differentiation. The two parent family with a female breadwinner will not receive AFDC or Medicaid benefits if she becomes unemployed but will if either parent leaves the home.[16] Thus, even the more specific legislative objective of removing the structural incentive for fathers to desert their families in order to receive AFDC or derivatively Medicaid benefits is not served by the gender distinction.[17] Family breakup,

16. According to the uncontradicted affidavit of two of the named plaintiffs in this case, Cindy and William Westcott, their landlord, who was seeking overdue payment of their rent, suggested that they separate so that Cindy and her unborn child would be eligible to receive AFDC benefits. Affidavit of Cindy and William Westcott, June 6, 1977, ¶ 16 at 4.

17. The defendants have argued that § 607 is substantially related to serving two important governmental interests which are not served by providing similar benefits to families with unemployed mothers: minimizing abuse and maintaining the viability of the family as a unit by lessening the economic incentive for the father to desert because of his unemployment. In respect to the goal of minimizing abuse, the defendants have not articulated how § 607 furthers this goal except to state the obvious that the operation of § 607 precludes payments to some families. With regard to the objective of removing the economic incentive for the father's desertion, the court believes that that goal is subverted by limiting the coverage of the program on a gender basis to two parent families with needy children deprived of support because of paternal unemployment and not parental unemployment. Where the moth-

and not family stability, is a likely result of the gender differentiation.[18]

■ Section 607 and the implementing state regulations, moreover, cannot be saved from unconstitutionality by the assertion that they are designed to rectify past discrimination against women. *See Kahn v. Shevin, supra; Schlesinger v. Ballard,* 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975).[19] Unlike the widows' property tax exemption in *Kahn* or the longer tenure period for female naval officers upheld in *Schlesinger v. Ballard, supra,* the different treatment accorded the sexes by § 607 and the challenged Massachusetts welfare regulations does not operate to compensate women for past discrimination, economic or otherwise. Section 607 and the implementing state regulations do just the opposite. They penalize the woman wage earner and her family by denying her and her family the benefits of income maintenance and medical assistance when she becomes unemployed.

■ Not only does the gender distinction in § 607 and the implementing Massachusetts regulations fail the *Craig v. Boren* test, however, it is also constitutionally impermissible because it appears to rest on an "archaic and overbroad generalization," *Schlesinger v. Ballard, supra* at 508, 95 S.Ct. 572, about the role of women in society. *See Stanton v. Stanton, supra,* 421 U.S. at 14, 95 S.Ct. 1373; *cf. Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975).[20] The gender differentiation in § 607 and the implementing Massachusetts regulations rests on the assumption that mothers in two parent families are not breadwinners, so that loss of their earnings would not substantially affect the families' well being.[21] Although "the notion that

---

er is the breadwinner and she becomes unemployed, there is still an economic incentive for the father to desert. The defendants also suggest that the legislative choice embodied in § 607 should not be overturned because of the latitude afforded the legislature to address a problem step by step. The view that sex based classifications are entitled to the same kind of deference as are classifications based on other policies and interests within the context of social welfare legislation, however, has been recently rejected. *See Califano v. Goldfarb, supra,* 430 U.S. at 212 & n. 9, 97 S.Ct. 1021 (1977) (Opinion of Brennan, J., in which White, J., Marshall, J. and Powell, J., joined).

**18.** Hence, even under the different language of the vigorous rational basis test of *Reed,* the gender distinction in § 607 and the state regulations offends equal protection principles as an unreasonable classification which rests upon a ground of difference not fairly or substantially related to the objects of the legislation.

**19.** In the *Kahn* case, the Court found constitutional a Florida statute granting widows but not widowers a $500 property tax exemption and, in so doing, characterized the statute as "a state tax law reasonably designed to further the state policy of cushioning the financial impact of spousal loss upon the sex for which that loss imposes a disproportionately heavy burden." 416 U.S. at 355, 94 S.Ct. at 1737. And in *Schlesinger,* the Court concluded that a federal legislative scheme providing for a 13-year tenure period before mandatory discharge only for female commissioned naval officers, but not for their male counterparts, was constitutionally permissible. The Court reasoned

that the statutory distinction was premised on the differing professional opportunities that had been afforded female and male naval officers, and that a longer tenure period for women officers was consistent with the purpose of giving female officers fair programs for career advancement. 419 U.S. at 508, 95 S.Ct. 572.

**20.** In *Stanton,* the Court ruled, in the context of a suit brought to enforce a parent's obligation of child support, that a Utah statute specifying a different age of majority for males than for females violated the equal protection clause. 421 U.S. at 17, 95 S.Ct. 1373. In so ruling, the Court rejected outdated notions about females as a basis for legislating and noted: "[N]o longer is the female destined solely for the home and the rearing of the family, and only the male for the marketplace and the world of ideas." *Id.* at 14–15, 95 S.Ct. at 1378. In *Taylor,* the Court found that the systematic exclusion of women from jury panels from which petit jurors were drawn violated the defendant's "Sixth Amendment right to trial by an impartial jury drawn from a fair cross section of the community." 419 U.S. at 536, 95 S.Ct. at 700. Labor statistics demonstrating the significant participation of women in the work force "put to rest the suggestion that all women should be exempt from jury service based solely on their sex and their presumed role in the home." *Id.* at 535 n. 17, 95 S.Ct. at 700 n. 17.

**21.** *See* Griffiths, Sex Discrimination in Income Security Programs, 49 Notre Dame Law 534, in which the author concluded:

AFDC eligibility requirements also show legislators' lack of concern about unemploy-

men are more likely to be the primary supporters of their spouses and children is not entirely without empirical support," *Wiesenfeld v. Weinberger, supra,* 420 U.S. at 645, 95 S.Ct. at 1231, an assumption that all mothers are not breadwinners is clearly archaic and overbroad in view of recent labor force data which indicates that working wives with children do contribute significantly to their families' earnings.[22] Where the "archaic and overbroad generalization" that women are not breadwinners has provided the foundation for other legislation, the Supreme Court has not been reluctant to declare its unconstitutionality. *See Weinberger v. Wiesenfeld, supra* at 643, 95 S.Ct. 1225.[23] Consequently, the gender distinction in § 607 and the companion state regulations which rests on the notion that mothers in two parent families are not breadwinners cannot be tolerated under the equal protection clause.

The decisions of the Supreme Court in cases involving gender classifications within the Social Security Act also lead this court to the conclusion that § 607 and the state regulations offend the concept of equal protection. Of particular significance is *Weinberger v. Wiesenfeld, supra,* in which the Court ruled unconstitutional 42 U.S.C. § 402(g), a subsection of the Social Security Act providing for the payment of survivors' benefits based on the earnings of a deceased husband to his widow and the minor children of the couple while such benefits were not payable to the widower. In *Wiesenfeld,* the Court emphasized that § 402(g) operated so as "to deprive women of protection for their families which men receive as a result of their employment," *id.* at 645, 95 S.Ct. at 1232, and further observed that, in view of the legislative purpose of permitting the surviving parent to stay at home to care for the children, the classification also discriminated among surviving children solely on the basis of the sex of the surviving parent. *Id.* at 651, 95 S.Ct. 1225. Relying heavily on the reasoning in *Wiesenfeld,* a plurality of the Court in *Califano v. Goldfarb,* 430 U.S. 199, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977), condemned another provision of the Social Security Act, 42 U.S.C. § 402(f)(1)(D), that required widowers but not widows to prove dependency on their deceased spouses in order to qualify for survivors' benefits.[24] In the plurality's view § 402(f)(1)(D) discriminated against the covered female wage earner by giving her less protection for her surviving spouse than that afforded a male worker. *Id.* at 206–07, 97 S.Ct. 1021. (Opinion of Brennan, J.).[25] The *Wiesenfeld* reasoning also applies with full force to the present case. Section

ment among women. In states which provide AFDC to two-parent families, families with an *unemployed* father and an *employed* mother may qualify, but families with an *employed* father and *unemployed* mother may not. In 1961 when Congress first provided for federal aid to children who were in need as the result of the unemployment of a parent, such unemployment included that of either a mother or a father. However, in 1968 Congress changed the law to include only the unemployment of the father. Such is the strength of the assumption that the father is the breadwinner.
*Id.* at 543 (footnote omitted).

**22.** The median contribution of all wives who worked during 1974 was one-fourth of the family income. Bureau of Labor Statistics, U.S. Dept. of Labor, Monthly Labor Review, "Marital and Family Characteristics of the Labor Force, March 1975," 55 (November 1975). Twelve percent of all working wives or approximately 2.5 million wives contributed one-half or more of the family income. Women's Bu-

reau, U.S. Dept. of Labor, Women Workers Today, 9 (1976). It has been noted that a working wife's contribution to the family earnings is crucial when it pushes the family income over poverty level. *Id.*

**23.** The *Wiesenfeld* Court indicated that an "'archaic and overbroad' generalization . . . 'not . . . tolerated under the Constitution'" was the notion that "male workers' earnings are vital to the support of their families, while the earnings of female wage earners do not significantly contribute to their families' support." *Id.* at 643, 95 S.Ct. at 1231.

**24.** The decision in *Frontiero v. Richardson, supra,* also weighed heavily in the plurality opinion in *Goldfarb.*

**25.** In *Goldfarb,* Justice Stevens concurred in the judgment of the Court on the basis that the discrimination was not against the covered female wage earner but against the surviving male spouse. *Id.* at 218, 97 S.Ct. 1021.

607 and the implementing Massachusetts regulations function so as to deprive females of protection for their families that males receive in the event of unemployment, and they discriminate among the group, families with needy children, sought to be protected by the legislation.[26] In one important respect, however, this court believes that the discrimination worked by § 607 and the challenged state regulations is more harmful. The Social Security benefits denied in *Wiesenfeld* and *Goldfarb* were not subsistence or medical care payments designed to meet the basic needs of the plaintiffs as are the benefits denied the plaintiffs in the instant case.

Accordingly, for all of the foregoing reasons, this court finds that § 607 and the implementing Massachusetts regulations are unconstitutional.

## VI. *Remedy*

 Because the court finds § 607 and the implementing Massachusetts welfare regulations unconstitutional, a final question arises in respect to the proper remedy. The court must decide "whether it more nearly accords with Congress' wishes to eliminate its policy altogether or extend it in order to render what Congress plainly did intend, constitutional. . . ." *Welsh v. United States,* 398 U.S. 333, 355–56, 90 S.Ct. 1792, 1804, 26 L.Ed.2d 308 (1970) (Harlan, J., concurring). There are thus two remedial choices: elimination of the AFDC–U subprogram altogether because of its constitutional imperfection or extension of AFDC–U, and, derivatively, Medicaid benefits to those persons previously unconstitutionally excluded, the plaintiffs and the members of their class. In deciding whether to extend the coverage of the unconstitutional legislation to persons previously excluded or not, the court notes that the existence of a broad severability clause in the Social Security Act [27] reflects the Congressional wish that judicial interpretation of the Act leave as much of the statute intact as possible. *Id.* at 364, 90 S.Ct. 1792; *Robison v. Johnson,* 352 F.Supp. 848, 860 (D.Mass.1973), *rev'd. on other grounds,* 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974).

The test to determine whether extension or nullification is the proper remedial path to follow in such a case as the present one was articulated by Justice Harlan in *Welsh v. United States, supra* : "it is, . . . necessary to measure the intensity of commitment to the residual policy and consider the degree of disruption of the statutory scheme that would occur by extension as opposed to abrogation." *Id.,* 398 U.S. at 365, 90 S.Ct. at 1810. Under this test, extension is the appropriate remedial measure. Since 1935, Congress has been committed to the legislative policy of providing financial assistance to needy dependent children and their families. Congress has repeatedly demonstrated its commitment to the more specific goal of assisting needy

---

**26.** Three weeks after the decision in *Goldfarb* was rendered, the Court summarily affirmed the judgments of three separate three-judge courts holding another provision of the Social Security Act unconstitutional. *See Califano v. Silbowitz,* 430 U.S. 924, 97 S.Ct. 1539, 51 L.Ed.2d 768 (1977), *aff'g.,* 397 F.Supp. 862 (S.D.Fla.1975); *Califano v. Jablon,* 430 U.S. 924, 97 S.Ct. 1539, 51 L.Ed.2d 768 (1977), *aff'g.,* 399 F.Supp. 118 (D.Md.1975); *Califano v. Abbott,* 430 U.S. 924, 97 S.Ct. 1540, 51 L.Ed.2d 768 (1977). *See also Railroad Retirement Bd. v. Kalina,* 431 U.S. 909, 97 S.Ct. 2164, 53 L.Ed.2d 220 (1977), *aff'g.,* 541 F.2d 1204 (6th Cir. 1976). Only in *Califano v. Webster, supra,* has the Court in its recent line of decisions upheld a sex based distinction in the Social Security Act. The provision involved in *Webster* was the former 42 U.S.C. § 415 that had permitted a more

favorable formula to be used to calculate old age benefits for a retired female worker than for a retired male worker before the statute was amended to eliminate the gender distinction. Adopting the *Kahn v. Shevin, supra,* approach, the Court found that the favorable treatment was a deliberately made Congressional decision to compensate women for past economic discrimination in the job market. 430 U.S. at 318, 97 S.Ct. 1192.

**27.** The severability clause of the Social Security Act, 42 U.S.C. § 1303, provides: "If any provision of this chapter, or the application thereof to any person or circumstance, is held invalid, the remainder of the chapter, and the application of such provision to other persons or circumstances shall not be affected thereby." *Id.*

children and their families where there is parental unemployment by reenacting for five years and then making permanent the AFDC–U subprogram when it was originally passed as only a temporary measure. Extension of the coverage of the AFDC–U and derivatively the Medicaid programs is also less likely to disrupt the operation of these programs than would nullification. With respect to the future operation of these programs, families with unemployed mothers would simply be permitted to follow the same procedures and to show that they fulfill the same need and other eligibility standards that currently apply to families with unemployed fathers. In contrast, if provision of AFDC–U and derivatively Medicaid benefits were halted because of the constitutional defect, many persons would lose their very means of subsistence.

The decisions of the Supreme Court in *Weinberger v. Wiesenfeld, supra,* and *Califano v. Goldfarb, supra,* are also compelling on the question of the proper remedy. In both cases, the Supreme Court affirmed the judgment of three-judge district courts where extension of benefits that had been previously unconstitutionally denied to the plaintiffs had been ordered. *See Wiesenfeld v. Secretary of HEW,* 367 F.Supp. 981, 991 (D.N.J.1973); *Goldfarb v. Secretary, HEW,* 396 F.Supp. 308, 309 (E.D.N.Y.1975). Just last term, the Court summarily affirmed the judgment of a three-judge district court in *Califano v. Jablon,* 430 U.S. 924, 97 S.Ct. 1539, 51 L.Ed.2d 768 (1977), *aff'g.,* 399 F.Supp. 118 (D.Md.1975), in which the lower court decided to extend the social security benefits to persons who previously had to satisfy a proof of dependency requirement. 399 F.Supp. at 132.

As it appears to the court that the proper remedy in this case is extension rather than nullification an order will enter declaring 42 U.S.C. § 607 unconstitutional insofar as it establishes a classification which discriminates against families with children deprived of support or care because of the unemployment of the mother solely on the basis of sex, in violation of the plaintiffs' equal protection rights under the Due Process Clause of the Fifth Amendment to the United States Constitution; and enjoining the operation or enforcement of § 607 by defendant Califano insofar as it prohibits him from approving a Massachusetts plan or federal matching funds for Massachusetts to pay AFDC or Medicaid benefits to families deprived of support or care because of the unemployment of the mother. The order will also declare that 6 CHSR III, Subch. A, Pt. 301, § 301.03; Pt. 303, Subpt. A, §§ 303.01 & 303.04 are unconstitutional insofar as they make ineligible for AFDC benefits and derivatively Medicaid benefits families with children deprived of support or care because of the unemployment of the mother, while providing such benefits to families with children deprived of support because of the unemployment of the father in violation of the plaintiffs' rights to equal protection of the laws guaranteed by the Fourteenth Amendment to the United States Constitution; and will enjoin the operation or enforcement of 6 CHSR III, Subch. A, Pt. 301, § 301.03; Pt. 303, Subpt. A, §§ 303.01 & 303.04 insofar as they prohibit defendant Sharp from granting AFDC and Medicaid to families with children deprived of support or care because of the unemployment of their mother. Finally, the order will enjoin defendant Sharp from refusing to grant AFDC and Medicaid benefits to families with children deprived of support or care because of the unemployment of the mother in the same amounts and under the same standards as he provides such benefits to families with children deprived of support or care because of the unemployment of the father.

It will be so ordered.